**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 0:24-cv-60935-SMITH**

**JAYANNA JACKSON,** individually and on behalf of a class, , **MIKE GABELUS**, individually and on behalf of a class, and **SCOTT ROSS,** individually and on behalf of a class,

      Plaintiffs,

vs.

**CITY OF FORT LAUDERDALE, FLORIDA**, a Municipal Corporation; **RICK MAGLIONE,** individually, **ROBERT DEITRICH,** individually, **AVERY FIGUERAS,** individually, **PAUL CRISTAFARO,** individually, **STEVEN SMITH,** individually, **ZACHARY BARO,** individually, **CAMERON BURDICK,** individually, **JAN CALDERA,** individually, **JAMIE CHATMAN,** individually, **JESUS FERNANDEZ,** individually, **ANDREW GOTTSTEIN,** individually, **JEFFREY JENKINS,** individually, **RAYMOND KETCHMARK,** individually, **RONALD MAGNO,** individually, **REMY RODRIGUEZ,** individually, **ELIEZER RAMOS,** individually, individually, **ROBERT SMITH,** individually, **DAVID SOIKA,** individually, **SEAN WALTERS**, individually,

      Defendants.

_____/

**FIRST AMENDED CLASS ACTION COMPLAINT**

      On May 31, 2020, hundreds of law-abiding persons were peacefully demonstrating against police brutality following the highly publicized police-murder of George Floyd, gathering at the FAU Parking Garage in Fort Lauderdale, Broward County, Florida. The Fort Lauderdale Police Department (FLPD) dispersed the assembly using tear gas and kinetic impact projectiles (KIPs) without warning or dispersal order, because the FLPD disagreed with the demonstrators' message and decision to assemble. The police action was unconstitutional. This class action seeks justice and compensation on behalf of every peaceful demonstrator assembled that day.

## JURISDICTION

1. The claims asserted arise pursuant to 42 U.S.C. §§ 1983 and 1988, the First Amendment, Fourth Amendment, and Fourteenth Amendment to the United States Constitution, and the Constitution and laws of the State of Florida. This Court has jurisdiction to consider all claims.

2. This Court has original jurisdiction over claims brought pursuant to 42 U.S.C. § 1983 and concurrent subject matter jurisdiction over claims brought pursuant to the Constitution and laws of the State of Florida. Damages well exceed $75,000.

3. Venue is proper in Broward County, Florida, in the Southern District of Florida, because it is where the events complained of occurred, where defendant City of Fort Lauderdale is headquartered, and where the named and unidentified individual defendants work or undertook the actions that are the subject of this complaint.

4. All conditions precedent have otherwise occurred, been performed, been met, been waived, would be futile, or are otherwise inapplicable.

## PARTIES

5. Plaintiffs Jayanna Jackson and Mike Gabelus were, at the time of the actions described in the complaint, residents of Broward County, Florida, and citizens of the United States of America and the State of Florida.

6. Plaintiff Scott Ross was, at the time of the actions described in the complaint, a resident of Miami-Dade County, Florida, and a citizen of the United States of America and the State of Florida. He was, at the time of the actions described in the complaint, engaged in lawful activities in Fort Lauderdale, Broward County, Florida.

7. At all relevant times, defendant City of Fort Lauderdale ("City") is and was a duly

organized municipal government corporation and public entity existing under the laws of the State of Florida. At all relevant times, City was the employer of the Officer Defendants. The Fort Lauderdale Police Department is a Department within the City.

8.     At all relevant times, the Officer Defendants (Defendants Rick Maglione, Robert Deitrich, Avery Figueras, S Paul Cristafaro, Steven Smith, Zachary Baro, Cameron Burdick, Jan Caldera, Jamie Chatman, Jesus Fernandez, Andrew Gottstein, Jeffrey Jenkins, Raymond Ketchmark, Ronald Magno, Remy Rodriguez, Eliezer Ramos, Robert Smith, David Soika, and Sean Walters) were duly authorized employees of the City and the FLPD. At the times relevant to the conduct described in this complaint, the Officer Defendants were licensed police officers within the State of Florida. On information and belief, the Officer Defendants are citizens of the State of Florida residing in the Southern District of Florida and are over the age of 18.

## RELEVANT FACTS COMMON TO ALL COUNTS

9.     After the Black Lives Matter march at Huizenga Park, Fort Lauderdale, FL concluded on May 31, 2020, some participants continued their peaceful assembly and observing of events on SE 1st Ave, a street that had been set aside for their use.

10.     At the corner of SE 2nd Street and SE 1st Avenue, some participants began chanting and displaying their signs to Officer Hayes, one of two officers at the corner who were blocking traffic for them.

11.     Officer Hayes falsely advised over the police radio that a crowd had surrounded her and later that they "jump on" her vehicle. Officer Hayes requested that additional units respond to her location.

12.     Officer Hayes, however, admitted under oath she did not actually see anyone jumping on her vehicle. Her communication via police radio that people were jumping on her car

was a fabrication.

13.     Officer Hayes, while outnumbered, was never under attack or under threat of attack. No one saw her under attack. To the contrary, upon exiting her car after the arrival of more police units, Officer Hayes took time to converse with one of the demonstrators.

**I.      Background**

        **A.      FLPD deploys force to disperse the entire crowd at the intersection but provides no warning or dispersal order.**

14.     The Fort Lauderdale Police Field Force team and SWAT personnel responded to Detective Hayes' location to disperse the crowd. However, it was FLPD's presence in riot gear, the sounds of deployed force, and the excessive use of force at a march against excessive force that attracted demonstrators to the area and provided a cause to demonstrate.

15.     Officer Steven Pohorence was one such officer who responded. Although Pohorence observed no misconduct or violence, he went into the peaceful crowd that was sufficiently far enough from Officer Hayes and began pushing the crowd away from the intersection. While dispersing the crowd, he used force against a law-abiding, kneeling demonstrator at around 6:52:07 p.m., agitating the crowd. In response, some crowd members threw water bottles at Officer Pohorence. The two motorman officers in the crowd with Pohorence had no water bottles thrown at them.

16.     It is a fact, and the City has conceded the fact, that the first act of violence toward a City of Fort Lauderdale Police Officer at the corner of SE 2nd Street and SE 1st Avenue took place only after Pohorence pushed the kneeling demonstrator.

17.     No FLPD officer at SE 2nd Street & SE 1st Ave was confronted with burning buildings, burning cars, Molotov cocktails, or looting of businesses like some police departments around the nation during the George Floyd protests.

18.     Pohorence was quickly removed from the intersection, and the response to his conduct was completed and finished in ten seconds, ending by 6:52:17 p.m. The crowd continued its peaceful assemblage.

19.     FLPD continued its dispersal efforts. At 6:52:56 p.m., FLPD officers in the area were given multiple warnings to them alone to put on gas masks. No warning was made to the assembly.

20.     At 6:54:39 p.m., a radio announcement advised FLPD officers west of the garage to leave the area, because they were going to deploy gas from the east. This warning was not given to the assembly.

21.     FLPD did not declare the assembly unlawful pursuant to Section 870.04, Florida Statutes, and did not issue a dispersal order before deploying tear gas.

22.     The curfew time had not arrived yet and the City never revoked the permission granted to use this public space by issuing a dispersal order or formally declaring the assembly unlawful.

23.     At 6:55:08 p.m., without prior notice to the assembly, FLPD deployed indiscriminate force against demonstrators lawfully assembled at the parking garage.

24.     FLPD used tear gas and KIPs to disperse the entire assembly.

25.     FLPD officers knew tear gas and KIPs were dispersing the crowd.

26.     FLPD deployed indiscriminate force under the assumption that every person assembled at the Parking Garage had violent intentions and was therefore subject to dispersal and force. FLPD believed that since the earlier Black Lives Matter demonstration had ended, everyone with peaceful intentions should have left, and those remaining had no legitimate reason to be there.

27.     FLPD unconstitutionally treated the assembly as one unit, lumping the 99% of

nonviolent demonstrators with the 1% of individuals who engaged in episodic responses to FLPD's deployment of force.

28.     The decisions to deploy force took into consideration the decision of the plaintiffs and class members to peacefully assemble, protest, and observe, as well as the substance of their speech. Mere presence and/or anti-police sentiment and disagreeable speech were deemed indicators of violence that justified the deployment of indiscriminate force against the entire crowd.

29.     Each FLPD officer had a different role, but each worked toward the unified police goal of clearing out SE 2nd Street & SE 1st Ave of all who had assembled.

30.     The Field Force Team headed by Captain Deitrich formed a scrimmage line at around 7:01 pm.

31.     The Field Force Team and SWAT attachment were not guarding public property at the Parking Garage from imminent acts of vandalism. Nor was FLPD deploying reasonable force in self-defense or defense of others. FLPD went to the garage to disperse the assembly.

32.     While dispersing the assembly, on scene officers provided updates via radio of the crowd's diminishing size to the Police Command Center.

33.     After deploying less lethal munitions for more than one hour, FLPD finally issued a dispersal order at 7:57 p.m., at which time demonstrators were given 10 minutes to disperse. The remaining assembly immediately began dispersing, even while the order was being broadcast, with many running away from the police force.

34.     Once Field Force left the area, no people assembled at the Parking Garage to watch them.

## B.     Weapons Deployed

35.     On May 31, 2020, FLPD deployed 205 chemical munitions and Kinetic Impact Projectiles (KIPs). Specifically, they deployed: 55 cans of throwable CS chemical munitions, 10 throwable OC chemical munitions, 10 cans of OC/CS clear-out, 100 kinetic impact projectiles, and 8 noise flash diversionary devices.

36.     The multiple officers who fired the 100 KIP rounds did not justify or articulate in any reports or BWC footage who they fired at and what that person was doing that would justify or require them to use that level of force, with the exception of one.

37.     Tear gas cannisters thrown high in the air with velocity can cause death or serious injury because of the risk of striking someone's head.

38.     FLPD deployed tear gas cannisters into the air with high velocity at the Parking Garage.

39.     Tear gas causes serious bodily injury including irritation to the skin, eyes, mouth, nose, and lungs of the recipient.

40.     Kinetic impact projectiles (KIPs) function by transferring kinetic energy from a weapon into the body of an individual. KIPs, including rubber and foam bullets, are shot from gun-like weapons or launchers, and many have muzzle velocities equal to those of live ammunition.

41.     The impact from a KIP can be described as delivering an impact similar to that of being struck by a fast-thrown or hit baseball.

42.     FLPD policy categorizes chest shots as the Red Zone, because of the potential for causing serious or fatal injury. Targeting the chest is similar to the use of deadly force.

43.     Despite this information known to FLPD and law enforcement, FLPD trained its officers that the target area to engage a subject with 40mm impact projectiles (KIPS) included the chest.

44.    Several individuals assembled were struck in the face by police deployed KIPs.

45.

### C.    The Plaintiffs

46.    Plaintiffs Jayanna Jackson and Mike Gabelus participated in the May 31, 2020 Fort Lauderdale assembly for justice.

47.    Plaintiffs Jayanna Jackson and Mike Gabelus were part of the assembly and demonstration against police brutality at the Parking Garage.

48.    Plaintiff Scott Ross attended the May 31, 2020 Fort Lauderdale assembly for justice to observe and record the proceeding.

49.    Plaintiffs did not throw objects or engage in violence. They at all times were peacefully assembled, protesting, and/or observing, in the exercise of their fundamental constitutional rights.

50.    Plaintiffs Jayanna Jackson, Mike Gabelus, and Scott Ross were struck with tear gas that caused them to stop their lawful and peaceful assembly, protest, and observation.

51.    Plaintiffs received no warning before the police deployed tear gas and KIPs.

### II.    Municipal Liability Allegations.

### A.    Final Policymaker Theory / Delegation Theory

52.    The FLPD Chief of Police is the final policymaker for policies governing FLPD policing. The Chief of Police reviews and approves FLPD policies before their implementation and dissemination.

53.    Fort Lauderdale is a Manager-Commission form of municipal government. The City Manager does not "weigh in," "guide," or suggest police policy or tactics implemented and used in the City of Fort Lauderdale. The City Manager has no authority for the development of

police policies, protocols, procedures, and the implementation of police policies, protocols, and procedures.

54.    Chief of Police Rick Maglione authorized the deployment of KIPs and tear gas during the assembly.

55.    Maglione knew tear gas and KIPs were deployed to disperse the crowd, and that KIPs and tear gas were deployed after Officer Hayes was no longer at the Parking Garage.

56.    Maglione knew less lethal weaponry was being deployed without warning or a dispersal order by subordinate FLPD officers.

57.    Maglione had the authority to stop the use of tear gas and kinetic impact projectiles from being deployed.

58.    Maglione had the means to contact officers at the Parking Garage.

59.    Maglione gave no instructions to stop using tear gas, chemical munitions, and KIPs, and did not direct his subordinates to issue such orders.

60.    FLPD delegated authority to subordinates to exercise discretion when to deploy crowd control tactics against a demonstration.

61.    FLPD has no official policy on the deployment of tear gas and KIPS in crowd control situations that constrain the deployment of force against crowds containing peaceful, nonviolent demonstrators.

62.    The decision to deploy force was not subject to supervision or review, except to the extent that those delegated the authority, in their sole and unsupervised discretion, deemed appropriate.

### B.    Supervisory Authority Allegations

63.    City officials monitored the police response from the Real-Time Crime Center

(RTCC) via police radio and television coverage. The monitoring group included the City Manager, all three Assistant Chiefs of Police, including Incident Commander Assistant Chief Douglas MacDougall, several police Majors, and SWAT Commander Captain Steven Greenlaw, among others. The Chief of Police was constantly on the phone with the monitoring group and participated in major decisions via telephone.

64.     The following officers ("Supervising Officers") had supervisory authority over the FLPD officers who deployed chemical munitions and KIPs near the corner of SE 2nd Street and SE 1st Avenue: Chief of Police Rick Maglione, Assistant Chief of Police and Incident Commander Douglas MacDoughall, SWAT Command Captain Steven Greenlaw, Field Force Commander Captain Robert Deitrich, SWAT Executive Officer Lieutenant Avery Figueras, S.W.A.T. Team Leader/Supervisor Paul Cristafaro, and SWAT Team Leader/Supervisor Steven Smith.

65.     The Supervising Officers knew tear gas, chemical munitions, and KIPs were being deployed, that the assembly was being dispersed with tear gas and KIPs, and that no warning or dispersal order was given before the deployments of tear gas and KIPs.

66.     Defendants Deitrich, Figueras, Cristafaro, and Smith have provided sworn testimony or submitted sworn statements saying so.

67.     The Supervising Officers had the authority and ability to halt the deployment of tear gas and KIPs, including their deployment without warning or dispersal order, but failed to do so.

68.     The following Supervising Officers provided authorization for the deployment of tear gas and KIPs: Chief of Police Rick Maglione, SWAT Command Captain Steven Greenlaw, Field Force Commander Captain Robert Deitrich, SWAT Executive Officer Lieutenant Avery Figueras,

69.     The following Supervising Officers gave on-scene command to deploy tear gas and KIPs against demonstrators: SWAT Executive Officer Lieutenant Avery Figueras, SWAT Team Leader/Supervisor Paul Cristafaro, SWAT Team Leader/Supervisor Steven Smith.

**C.    Dispersal orders not given as a matter of Department policy.**

70.     FLPD's policy requires dispersal orders before making mass arrests, but FLPD has no policy governing the dispersal of an assembly determined to be unlawful, riotous, or tumultuous.

71.     Contrary to Section 870.04, Florida Statutes, requiring that law enforcement give dispersal orders to groups they determine are unlawfully, riotously, or tumultuously assembled, FLPD trained its officers that no dispersal orders were necessary when responding to a scene if bottles were thrown.

72.     By policy, custom, and practice, FLPD does not give the dispersal orders required by law, even where it has the means and ability to give a dispersal order.

73.     Defendant Jeffrey Jenkins was assigned to the LRAD. FLPD pre-recorded a dispersal order on the Long-Range Acoustic Device (LRAD).

74.     The Field Force Team brought the LRAD and dispersal order with them to the Parking Garage.

75.     Upon arrival to the Parking Garage, Defendant Jeffrey Jenkins did not turn on the LRAD's dispersal order before getting out of the Suburban, based on his claimed training that dispersal orders were unnecessary if the police were responding to a scene where water bottles were thrown.

76.     Defendant Jenkins had every opportunity as well as the ability to stop the dispersal without warning.

### D.      Failure to Train

77.     Conspicuously absent is an FLPD policy providing guidance to department members when to make announcements of unlawful assemblies and dispersal orders absent the intent to make mass arrests as outlined in policy 501.10.

78.     The department-wide Field Force trained officers how to put on gas masks when deploying tear gas. The course does not address how to deploy tear gas or kinetic impact projectiles during a crowd control situation. That is not a training objective of the course.

79.     FLPD provides SWAT and field training officers a course on 40 mm Multi Launcher Operator. The course does not address the use of tear gas and less lethal munitions specifically in crowd control situations.

80.     SWAT convenes for training twice a month.

81.     A Police Practices Expert reviewed the file and evidence of FLPD's response at the Parking Garage. He opined that FLPD failed to adequately train its officers to perform tasks that are "keenly obvious during incidents of civil unrest," including:

- When and how to announce an unlawful assembly and dispersal orders,
- Using force only when reasonably necessary, and only directed at specific individuals, not indiscriminate force that will likely harm innocent persons known to be in the area,
- Moving targets

82.     Another Police Practices Expert offered similar testimony that the absence of officer training on crowd management was "clearly and obviously deficient."

83.     Another Police Practices Expert, addressing the failure to train officers on deploying KIPs with gas masks on, opined that "The need for such training should be obvious because officers being deployed to handle crowd control situations that might feature the use of teargas is predictable."

### III.       The On-Scene SWAT Defendant Allegations

84.     After the incident, several SWAT team members submitted incident reports and provided testimony during an Internal Affairs (IA) investigation. The timelines in their reports and testimony are misleading and materially contradicted by available body-worn camera footage. Nevertheless, their accounts do establish the following:

85.     SWAT members were assigned to several quick reactionary teams. Each SWAT team's vehicle was equipped with a 40 mm launcher with gas and foam baton rounds, throwable gas and smoke canisters, and Noise Flash Diversionary Devices (NFDD).

86.     None of the SWAT members provided a dispersal order, declaration of unlawful assembly, or warning before deploying force.

87.     Several FLPD SWAT Officers were deployed to the Parking Garage. They witnessed the dispersal and deployment of force against peaceful demonstrators, without warning, but took no action to intervene even though they were in a position to intervene.

88.     Instead of intervening, some officers joked and laughed about the force being deployed or stood idly by while others deployed unlawful force.

89.     The following SWAT Team Members deployed chemical munitions, including clear-out munitions and munitions that broke into three pieces, at or near the corner of SE 2nd Street and SE 1st Avenue, with an intent to disperse the crowd: Aryo Rezaie, SWAT Team Leader Zachary Baro, Cameron Burdick, SWAT Team Leader Paul Cristafaro, Jesus Fernandez, Raymond Ketchmark, SWAT Team Leader Lt. Ronald Magno, Remy Rodriguez, Eliezer Ramos, Robert Smith, and Sean Walters.

90.     Defendant Cristafaro admitted the objective was crowd dispersal, stating, "Cause that's the goal; I mean, you just want to -- you just want to disperse the crowd. You're trying to

move the crowd. You're not trying to injure anybody, you're just trying to get the crowd to leave, go home."

91.     Defendants Cristafaro and SWAT Team Leader Steve Smith discussed the deployment of chemical munitions to disperse the assembly, with Smith communicating commands to other SWAT officers to deploy them for this purpose.

92.     Defendant Ketchmark deployed a gas munition within the assembly that broke into three pieces, emitting green smoke. Ketchmark claimed this was a Department-issued munition functioning as designed; however, other Department members stated that the green smoke-emitting munition was not Department-issued. Upon information and belief, Ketchmark deployed the first round of tear gas.

93.     Team Leader Defendant Zach Baro admitted to deploying chemical munitions and KIPs to disperse the assembly. Body-worn camera footage captured Baro saying, "Beat it, little f***er," as a protester was struck.

94.     BWC footage showed Defendant Jamie Chatman approaching Defendant Zach Baro behind the police line, asking if Baro's body camera was off. Baro responded — incorrectly — that his camera was in "stand-by" mode and not recording. The two officers then laughed and joked about the individuals they had struck with KIPs. "Did you see me f**k up those motherf**rs?" one officer remarked. "I got the one f*er," the other replied amidst laughter.

95.     Defendant Burdick deployed chemical munitions to disperse the crowd. He was tasked with preparing the Long-Range Acoustic Device (LRAD) and assisted Defendant Lt. Jenkins with setting up the pre-recorded dispersal order.

96.     Defendant Eliezer Ramos admitted to deploying tear gas and that tear gas canisters were deployed to disperse the crowd. Ramos is seen on BWC asking permission to deploy a tear

gas cannister at a crowd containing a person who made a statement with which he disagreed.

97.    Defendant Steve Smith confirmed his deployment of chemical munitions to disperse the crowd, describing them as "canisters of mace to cause an irritant and burning, hoping to disorient people and make them leave the area." Smith deployed several rounds of throwable chemical munitions canisters and Noise Flash Diversionary Devices (NFDDs) without warning, leaving some officers mistakenly perceiving the NFDDs as coming from demonstrators.

98.    When asked about the necessity for chemical munitions, Ronald Magno responded, "To redirect the crowd, hoping really to disperse them." Magno also acknowledged that thrown canisters "can cause injury to a head, an eye." Magno also knew that officers deploying KIPs were consistently missing and was joking about it with another officer.

99.    Defendant Sean Walters admitted awareness of peaceful demonstrators and confirmed that he deployed chemical munitions to disperse the crowd.

100.    Defendant Remy Rodriguez admitted to deploying chemical munitions into crowds containing peaceful demonstrators. He gassed nonviolent individuals. He acknowledged that his assignment included dispersing the assembly with chemical munitions.

101.    SWAT Operator Jan Caldera provided security for SWAT officers dispersing the crowd.

102.    The following SWAT Team Members deployed KIPs at or near the corner of SE 2nd Street and SE 1st Avenue with an intent to disperse the crowd: SWAT Team Leader Zachary Baro, Jamie Chatman, Jesus Fernandez, Ryan Ijames, SWAT Team Leader Lt. Ronald Magno, and Eliezer Ramos.

103.    Defendant Remy Fernandez explained during the IA Investigation: "I deployed launchable 40MM CS rounds in a downward angle in an effort to disperse the crowd." (Complete

543). Fernandez admitted that "For the most part the gas was in an area to disperse a crowd." (Complete 190).

104.    The following SWAT Team Members provided lethal cover at or near the corner of SE 2nd Street and SE 1st Avenue to protect the other SWAT operators and Field Force Team who were dispersing the assembly: Cameron Burdick, Kevin Dupree, Andrew Gottstein, Aryo Rezaie, Remy Rodriguez, Franco Smith, David Soika, and Sean Walters. Every one of these officers could have provided a dispersal order.

105.    David Soika knew tear gas was used as a form of crowd dispersal. He explained: "We were using the gas just purely to disperse them."

106.    The following SWAT Team Members deployed NFDDs at or near the corner of SE 2nd Street and SE 1st Avenue with an intent to disperse the crowd: SWAT Team Leader Steven Smith.

107.    FLPD officers on scene had the opportunity and could have intervened to stop the deployment of tear gas and KIPs into the crowd of peaceful demonstrators.

108.    FLPD officers on scene had the opportunity and could have intervened to stop the deployment of tear gas and KIPs without prior warning or dispersal order.

109.    SWAT officers congratulated, celebrated, and joked with each other about hitting individuals with KIPs.

### IV.        Class Action Allegations

110.    Plaintiffs each bring this action on their own behalf and on behalf of a class of all other persons similarly situated pursuant to Rule 23(b)(3), Federal Rules of Civil Procedure. The damages class is defined as those persons who were present at or near SE 2nd Street and SE 1st Avenue, on May 31, 2020, between 6:50 p.m. and 8:00 p.m., who were subjected to FLPD's crowd

dispersal tactics. This damages class includes two subclasses: 1) those subject to less-lethal force; and 2) those who were not subject to less lethal force but were driven from the area as a result of FLPD dispersal tactics.

111.    The proposed injunctive relief class is defined as all persons who have in the past, including those present at or near SE 2nd Street and SE 1st Avenue, on May 31, 2020, between 6:50 p.m. and 8:00 p.m., or may in the future, participate in, or be present at, demonstrations within the City in the exercise of their rights of free speech, assembly, and petition in general, and particularly as related to protesting police violence and discrimination against people of color, especially Black Americans.

112.    The proposed class representatives include Jayanna Jackson, Mike Gabelus, and Scott Ross.

113.    In accordance with Fed. R. Civ. P. Rule 23(a), the class is so numerous that joinder of all members is impracticable. Plaintiffs do not know the exact number of class members. FLPD officers described the crowd present at or near SE 2nd Street and SE 1st Avenue, on May 31, 2020, as numbering 300-500 people when the police arrived. Plaintiffs are informed, believe, and allege that there are in excess of 300-500 members of the class.

114.    In accordance with Fed. R. Civ. P. 23(a), there are questions of fact common to the class. Plaintiffs are informed, believe, and allege that the common questions of fact include, but are not limited to, the following:

      a.   Did Defendants deploy force with an intent to disperse the crowd?

      b.   Did Defendants give a dispersal order before deploying force?

      c.   Did Defendants have an opportunity to give a dispersal order?

      d.   Did Defendants issue a declaration of unlawful assembly?

e.  What opportunity did the Defendants give the peaceful participants to disperse before deploying less-lethal force?

f.  What degree of force did Defendants use against the peaceful participants, e.g., what degree of force does shooting a person with a "less than lethal" weapon actually represent?

g.  Whether Defendants used force against the peaceful participants for the purpose of interfering with the peaceful participants' right to freedom of speech?

h.  Whether Defendants engaged in content-discrimination and viewpoint discrimination?

115.    In accordance with Fed. R. Civ. P. 23(a), there are questions of law common to the class. Plaintiffs are informed, believe, and allege that the common questions of law include, but are not limited to, the following:

a.  Whether the peacefully assembled persons were engaged in First Amendment protected activity?

b.  Whether Defendants' deployment of tear gas and KIPs, and other dispersal tactics adversely affected protect speech?

c.  Whether there was a causal connection between the protected speech and the deployment of tear gad and KIPs?

d.  Whether final policymakers authorized the conduct that violated the rights of demonstrators?

e.  Whether the alleged failures to train were a moving force for the alleged constitutional violations?

f.  Whether the due process clause required Defendants to give notice of their determination of unlawful assembly and provide an opportunity to comply before forcefully dispersing the assembly?

g.  Whether the force used was lawful?

h.  Whether the alleged violations were clearly established?

i.  Whether the Supervising Defendants are liable under a supervisor theory of liability?

j.  Whether the on-scene officers are liable for their failure to intervene to stop other officers from deploying tear gas and KIPs, in violation of the U.S. Constitution and

laws of the United States and the State of Florida?

k.  Whether Defendants were permitted to use force, including firing projectiles at peaceful participants, without warning?

l.  Whether the crowd was in a public forum?

m.  Whether the deployment of force by FLPD, which restricted speech and assembly, was narrowly tailored to serve a significant governmental interest?

n.  Whether the force Defendants used was constitutionally reasonable?

116.    In accordance with Fed. R. Civ. P. 23(a), the claims of the representative Plaintiffs are typical of the class they represent. Each representative Plaintiff was present on or near SE 2nd Street and SE 1st Avenue on May 31, 2024, between the hours of 6:50 p.m. and 8:00 p.m. Each representative Plaintiff engaged in peaceful protest or other lawful activities. Each representative Plaintiff was subject to dispersal by less-lethal force without warning, dispersal order, or declaration of unlawful assembly.

117.    Except for their presence in the assembly area, peaceful, verbal, non-violent protests, and observing Defendants, Plaintiffs did nothing to justify dispersal by the use of violent force. Defendants had no legal justification for ordering any representative Plaintiff to disperse and no legal justification for using force against any representative Plaintiff.

118.    Each representative Plaintiff has the same interests and suffered the same type of injuries as the class members. The claims of each representative Plaintiff arose because of FLPD's unlawful dispersal and use of force against the demonstrators. The claims of the representative Plaintiffs are based upon the same legal theories as the claims of the class members. Each representative class member suffered actual physical injuries as a result of Defendants' unlawful dispersal and use of force.

119.    In accordance with Fed. R. Civ. P. 23(a), the representative Plaintiffs will fairly and

adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

120.    In accordance with Federal Rule of Civil Procedure 23(b)(1)(A), prosecutions of separate actions by individual members of the class would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

121.    In accordance with Federal Rule of Civil Procedure 23(b)(1)(B), prosecutions of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

122.    In accordance with Federal Rule of Civil Procedure 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

123.    In accordance with Federal Rule of Civil Procedure 23(b)(3), this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. The interest of members of the class in individually controlling the prosecution of a separate action is low, in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed, believe, and allege that the amounts at stake for individuals are so small that separate suits would be impossible or impracticable. Plaintiffs are informed, believe, and allege that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe that Defendants have no records, or virtually no records or evidence of any kind, justifying the dispersal of the entire assembly, and that Defendants' claimed justifications for the wholesale dispersal of the assembly are based on facts

that apply to all protesters equally.

124.    Plaintiffs are informed and believe that it is desirable to concentrate all litigation in one forum because all of the claims arise from the same location, date, and time, i.e., in the vicinity of SE 2nd Street and SE 1st Avenue, on May 31, 2020, between 6:50 p.m. and 8:00 p.m., and a single forum will promote judicial efficiency to resolve the common questions of law and fact, rather than in multiple courts.

125.    Plaintiffs do not know the identities of all the class members. Plaintiffs are aware of the identities by name or social media handles of approximately 25 class members.

126.    In accordance with Federal Rule of Civil Procedure 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs contemplate notice through organizational "listserves" devoted to globalization and social justice issues as well as social media sites that announced the demonstrations. Plaintiffs contemplate that the notice will inform class members of the following:

   a.  The pendency of the class action, and the issues common to the class.

   b.  The nature of the action.

   c.  Their right to "opt out" of the action within a given time, in which event they will not be bound by a decision rendered in the class action.

   d.  Their right, if they do not "opt out," to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named Plaintiffs and their counsel.

   e.  Their right, if they do not "opt out," to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

127.    Plaintiffs' counsel are capable and experienced in complex civil litigation, class representations, and the issues on which this case will proceed.

128.     An Injunctive Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, in engaging in the aforementioned practices and failing to correct the aforementioned unconstitutional policies thereby making class-wide declaratory and injunctive relief appropriate.

129.     A Damages Class should be certified pursuant to Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual Class Members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. A class-wide proceeding will generate common answers to these questions.

## CAUSES OF ACTIONS

### COUNT I: Federal Civil Rights Violations – Unlawful First Amendment Restriction on Speech.

(All Defendants, but not the City)

130.     Plaintiffs reallege paragraphs 1 through 129.

131.     On May 31, 2020, Defendants stopped peaceful demonstrators from exercising their First Amendment rights. Plaintiffs were among the peaceful demonstrators.

132.     Plaintiffs and other demonstrators were in a public forum, set aside by FLPD for demonstrators to assemble and exercise their First Amendment rights.

133.     Defendants violated Plaintiffs' rights of freedom of speech and assembly under the First Amendment to the United States Constitution by disrupting their lawful First Amendment activities, including their peaceful demonstration against excessive force by law enforcement.

134.     Defendants violated Plaintiffs' First Amendment rights when they 1) stopped the speech and assembly of peaceful congregants gathered in a public forum set aside for them, 2) deployed tear gas and KIPs at crowds containing peaceful persons without warning, 3) deployed

force to disperse the crowd without giving a dispersal order, 4) stopped other First Amendment-protected activities by peaceful congregants, and/or 5) impermissibly lumping the 99% nonviolent protestors into the same category as the 1% of protestors who engaged in episodic resistance to FLPD's deployment of unlawful force.

135.     The deployment of tear gas and KIPs forced peaceful demonstrators to discontinue exercising their First Amendment rights.

136.     The restrictions on speech imposed by FLPD were not narrowly tailored to achieve a compelling governmental interest using the least restrictive means available.

137.     The defendants, individually and in concert with one another, deployed tear gas and KIPs that stopped peaceful demonstrations.

138.     The restrictions were not reasonable time, place, and manner restrictions.

139.     FLPD SWAT and Field Force Officers, who were on scene, were present, saw the alleged constitutional violations by other officers, but failed to take reasonable steps to protect peaceful demonstrators whose constitutional rights were violated.

140.     The Supervising officers either personally participated in the alleged constitutional violation, directed the subordinates to act unlawfully, or knew that the subordinates would act unlawfully and failed to stop them from doing so.

141.     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs suffered severe and permanent physical injury, emotional distress, and humiliation, and are entitled to monetary damages and other injunctive relief.

For these reasons, Plaintiffs demand judgment against all defendants (but not the City) for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems

just and proper.

## COUNT II: Federal Civil Rights Violations – Unlawful First Amendment Restriction on Speech.

### (The City)

142. Plaintiffs reallege paragraphs 1 through 129 and 131-138.

143. Final policymakers within the City authorized and directed the deployment of less lethal munitions at demonstrators at SE 2nd Street and SE 1st Avenue, in order to disperse the crowd.

144. FLPD's failure to adequately train its officers was a moving force behind the violation of Plaintiffs' constitutional rights alleged in this count.

145. FLPD's policy against providing dispersal orders was a moving force behind the constitutional law violations.

146. FLPD afforded its officers unbridled discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant vagueness and overbreadth concerns).

147. As a direct and proximate result of the City's unlawful conduct, Plaintiffs suffered physical injury, emotional distress, and humiliation, and are entitled to monetary damages.

For these reasons, Plaintiffs demand judgment against the City for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

## COUNT III: Federal Civil Rights Violations - First Amendment Retaliation.

### (All Defendants, but not the City)

148. Plaintiffs reallege paragraphs 1 through 129.

149. Plaintiffs were engaged in protected speech and lawful assembly.

150.    Defendants disrupted Plaintiffs' lawful First Amendment activities, including their peaceful demonstration against excessive force by law enforcement.

151.    The deployment of tear gas and KIPs into crowds containing peaceful demonstrators would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

152.    The FLPD forced peaceful demonstrators to discontinue exercising their First Amendment rights.

153.    There is a causal connection between Plaintiffs' speech and assembly and the deployment of force. Their speech and assembly were a substantial motivating factor behind FLPD's deployment of force that dispersed the crowd.

154.    FLPD knew not all demonstrators present were engaged in acts of violence and that no warning was given before dispersing the crowd. FLPD further knew Plaintiffs' assembly and speech would be adversely affected by their deployment of force.

155.    The FLPD deployed crowd control tactics primarily due to the presence of nonviolent demonstrators. FLPD significantly outnumbered the few individuals involved in isolated acts of violence and would have simply arrested them but for presence of the nonviolent demonstrators.

156.    FLPD SWAT and Field Force Officers who were on scene and were present, saw the alleged constitutional violations by other officers, but failed to take reasonable steps to protect peaceful demonstrators whose constitutional rights were violated.

157.    The Supervising Officers either personally participated in the alleged constitutional violation, directed the subordinates to act unlawfully, or knew that the subordinates would act unlawfully and failed to stop them from doing so.

158.    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs suffered severe and permanent physical injury, emotional distress, and humiliation, and are entitled to monetary damages and other injunctive relief.

For these reasons, Plaintiffs demand judgment against all defendants (but the City) for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

## COUNT IV: Federal Civil Rights Violations - First Amendment Retaliation.

### (The City)

159.    Plaintiffs reallege paragraphs 1 through 129 and 149-155.

160.    Final policymakers within the City authorized and directed the deployment of less lethal munitions at demonstrators at SE Second Street and SE First Avenue, in order to disperse the crowd.

161.    FLPD's failure to adequately train its officers was a moving force behind the violation of Plaintiffs' constitutional rights alleged in this count.

162.    As a direct and proximate result of the City's unlawful conduct, Plaintiffs suffered physical injury, emotional distress, and humiliation, and are entitled to monetary damages.

For these reasons, Plaintiffs demand judgment against the City for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

## COUNT V: Federal Civil Rights Violations – Fourteenth Amendment Substantive Due Process.

### (The City)

163.    Plaintiffs reallege paragraphs 1 through 129.

164.    The City violated the plaintiffs' substantive due process rights.

165.    Tear gas is a powerful agent capable of causing serious injury and is inherently an indiscriminate form of force. It should never be used to target individuals directly.

166.    Final policymakers within the City of Fort Lauderdale authorized and directed the use of tear gas and less lethal munitions against peaceful demonstrators without warning and without first issuing a lawful dispersal order.

167.    The deliberate use of indiscriminate force against nonviolent demonstrators violated their right to be free from excessive force.

168.    Deploying indiscriminate force on crowds that included peaceful demonstrators was not rationally related to any legitimate governmental objective.

169.    The purposeful, knowing, and intentional deployment of less-lethal munitions constituted an objectively unreasonable use of force that was conscience-shocking, malicious, sadistic, and/or objectively unreasonable.

170.    Final policymakers within the City authorized and directed the deployment of less lethal munitions at demonstrators at SE 2nd Street and SE 1st Avenue, in order to disperse the crowd.

171.    FLPD's failure to adequately train its officers was a moving force behind the violation of Plaintiffs' constitutional rights alleged in this count.

172.    FLPD's policy against providing dispersal orders was a moving force behind the constitutional law violations.

173.    As a direct and proximate result of the City's unlawful conduct, Plaintiffs suffered physical injury, emotional distress, and humiliation, and are entitled to monetary damages.

For these reasons, Plaintiffs demand judgment against the City for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

### COUNT VI: Federal Civil Rights Violations – Fourteenth Amendment Procedural Due Process
**(Defendants Maglione, Deitrich, Avery, Cristafaro, Baro, Steven Smith, Magno, Jenkins, Burdick, Chatman, and Ketchmark)**

174.    Plaintiffs reallege paragraphs 1 through 129.

175.    The due process clause provides that no state shall deprive any person of life, liberty, or property, without due process of law.

176.    Freedom of speech and the right to peacefully assemble in a public forum are fundamental components of the liberty safeguarded by the Due Process Clause to the U.S. Constitution.

177.    Before FLPD could deprive peaceful demonstrators of their First Amendment rights, they were entitled to due process.

178.    The common-sense procedural safeguards that protect persons peacefully assembling are half a millennia old. The earliest unlawful assembly laws, enacted during the reigns of King Edward VI (1549) and Queen Mary (1553), required notice to those assembled that their assembly was deemed unlawful by the authorities, an order to disperse, and an opportunity to disperse. William Blackstone, *Commentaries on the Laws of England, Vol. 4* \*82 (1769).[1]

179.    The English Riot Act of 1715, which imposed the death penalty for failing to disperse after the assembly as declared unlawful, riotous or tumultuous, similarly required an order

---

[1]                                 (available                      at                      chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://lonang.com/wp-content/download/Blackstone-CommentariesBk4.pdf).

to disperse and one hour to comply before one could be seized, apprehended, and taken before the Justices. Martin Hinton, *And The Riot Act Was Read!*, 24 Adelaide L. R. 79, 80 (2003).[2] The Riot Act of 1715, like the Riot Act of Queen Mary, indemnified any official who killed, maimed, or hurt a person who refused to disperse when ordered to do so. *Id*. at 86.

180.    The Florida legislature in 1868 codified those same procedural safeguards. Florida statutory law contains a mandatory requirement that law enforcement notify the assembly that their assembly has become unlawful, riotous, or tumultuous.

181.    If, during the dispersal, persons who refused to leave are killed or wounded by an officer, that officer is "guiltless and fully justified in law."

182.    In contrast, if a dispersing officer is killed or wounded, the persons who refused to leave are held answerable for the officer's death or injury.

183.    Applied here, regardless of whether FLPD could lawfully disperse the crowd, before dispersing a demonstration, and using force to effectuate that dispersal, 152 years of Florida law and 471 years of English law established the common-sense procedural safeguards. That is, law enforcement was required to provide notice that the assembly was unlawful, issue an order to disperse, and give demonstrators an opportunity to comply.

184.    At all material times, it was feasible for FLPD to provide notice that the assembly was unlawful, issue an order to disperse, and give demonstrators an opportunity to comply. They gave themselves two minutes of notice.

185.    Thus, although FLPD had the means of providing a dispersal order, FLPD chose not to issue a dispersal order.

---

[2] (available at http://classic.austlii.edu.au/au/journals/AdelLawRw/2003/6.pdf).

186.    Plaintiffs' Due Process rights were violated when the defendants, individually and in concert with each other, dispersed a demonstration using chemical agents and kinetic impact projectiles without providing notice, an opportunity to be heard, and opportunity to disperse in a way that a person of ordinary intelligence could understand and comply.

187.    There is no remedy at state law for the defendants' violation of Florida's unlawful assembly statutory procedure. Chapter 870 contains nor does Florida common law authorize a cause of action under Florida law for ignoring the requirements of notice and opportunity to disperse before the deployment of force.

188.    There is no adequate remedy at state law for challenging the defendants' dispersal of demonstrators, using force, without declaring their assembly unlawful and providing an opportunity to leave.

189.    There is no adequate remedy at state law for vindicating the denial of Plaintiffs' right to assemble without due process.

190.    FLPD did not give Plaintiffs and other demonstrators a hearing before or after depriving them of their First Amendment rights to assemble in a public forum.

191.    FLPD SWAT and Field Force Officers, who were on scene, were present, saw the alleged constitutional violations by other officers, but failed to take reasonable steps to protect peaceful demonstrators whose constitutional rights were violated.

192.    The Supervising officers either personally participated in the alleged constitutional violation, directed the subordinates to act unlawfully, or knew that the subordinates would act unlawfully and failed to stop them from doing so. As a direct and proximate result of defendants' unlawful conduct, Plaintiffs suffered severe and permanent physical injury, emotional distress, and humiliation, and are entitled to monetary damages and other injunctive relief.

193.   As a direct and proximate result of defendants' unlawful conduct, Plaintiffs suffered severe and permanent physical injury, emotional distress, and humiliation, and are entitled to monetary damages and other injunctive relief.

For these reasons, Plaintiffs demand judgment against the City for compensatory damages, costs, injunctive relief, attorney's fees, and such other and further relief as the Court deems appropriate.

## COUNT VII: Federal Civil Rights Violations – Fourteenth Amendment Procedural Due Process
### (The City)

194.   Plaintiffs reallege paragraphs 1 through 129 and 175-190.

195.   Final policymakers within the City authorized and directed the deployment of less lethal munitions at demonstrators at SE 2nd Street and SE 1st Avenue, in order to disperse the crowd.

196.   FLPD's failure to properly train its officers was a moving force behind the violation of Plaintiffs' constitutional rights alleged in this count.

197.   It was the City's policy, as well as its failure to train and supervise its officers on the requirement of Florida law, and issue corrective instructions after violations were brought to light, that caused the due process violations.

198.   FLPD's policy against providing dispersal orders was a moving force behind the constitutional law violations.

199.   As a direct and proximate result of the City's unlawful conduct, Plaintiffs suffered physical injury, emotional distress, and humiliation, and are entitled to monetary damages.

For these reasons, Plaintiffs demand judgment against the City for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action,

reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial as to all counts so authorized.

| | |
|---|---|
| **RATZAN WEISSMAN & BOLDT** | **KUEHNE DAVIS LAW, P.A.** |
| 2850 Tigertail Avenue, Suite 400 | 100 SE 2 Street, Suite 3105 |
| Coconut Grove, FL 33133 | Miami, FL 33131 |
| Tele: 305.374.6366 | Tel: 305.789.5989 |
| Fax: 305.374.6755 | Fax: 305.789.5987 |
| Stuart@rwblawyers.com | ben.kuehne@kuehnelaw.com |
| StuartW@rwblawyers.com | mdavis@kuehnelaw.com |
| Kimberly@rwblawyers.com | johand@kuehnelaw.com |
| | efiling@kuehnelaw.com |

By:    _s/ Stuart N. Ratzan_
**STUART N. RATZAN**
Florida Bar No. 911445
**STUART J. WEISSMAN**
Florida Bar No. 57909
**KIMBERLY L. BOLDT**
Florida Bar No. 957399

By:    _S/ Michael T. Davis_
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**JOHAN D. DOS SANTOS**
Florida Bar No. 1025373

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify on November 12, 2024, I electronically filed this document with the Clerk using

CM/ECF, and certify this document is served on all counsel via transmission of Notices of

Electronic Filing generated by CM/ECF.

By:    _S/ Michael T. Davis_
**MICHAEL T. DAVIS**