## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-cv-60935-SMITH

JAYANNA JACKSON, *et al.*,

      Plaintiffs,

v.

CITY OF FORT LAUDERDALE, *et al.*,

      Defendants.

_____/

### DEFENDANTS' COMBINED MOTION TO DISMISS
### PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

Defendants, CITY OF FORT LAUDERDALE ("City"), RICK MAGLIONE, ROBERT DIETRICH, AVERY FIGUERAS, PAUL CRISTAFARO, and STEVEN SMITH (collectively, the "Supervising Officers") and ARYO REZAIE, ZACHARY BARO, CAMERON BURDICK, JUAN CALDERA, JAMIE CHATMAN,  KEVIN DUPREE, JESUS FERNANDEZ, RYAN IJAMES, ANDREW GOTTSTEIN, JEFFREY JENKINS, RAYMOND KETCHMARK, RONALD MAGNO, ELIEZER RAMOS, FRANCO SMITH, ROBERT SMITH, DAVID SOIKA and SEAN WALTERS (collectively "Non-Supervising Officers"), by and through their undersigned counsel and pursuant to Rule 12(b)(6), Fed. R. Civ. P., Local Rule 7.1, S.D. Fla. L.R., and in compliance with this Court's Paperless Order (DE 48), herein move to dismiss Plaintiffs' First Amended Class Action Complaint (DE 23) (hereinafter "Complaint" and state as follows:

      1.      Plaintiffs, three (3) individuals, purport to assert a class action against the City and numerous Fort Lauderdale Police Department ("FLPD") officers, asserting claims pursuant to 42 U.S.C. § 1983 arising out of their allegations that they were "struck with tear gas that caused them to stop their lawful and peaceful assembly, protest, and observation" on May 31, 2020, while they were participating in (Plaintiffs Jackson and Gabelus) or observing and recording (Plaintiff Ross)

1

protests related to George Floyd's death.[1]  (DE 23, p. 1; ¶¶ 46-50). Notably, Plaintiffs do not allege that any of them were struck by a kinetic impact projectile ("KIP").

    2.    Plaintiffs have sued *twenty (20)* named Defendants, including the City and nineteen (19) FLPD officers, whom Plaintiffs allege "were duly authorized employees of the City and the FLPD" and "licensed police officers within the State of Florida." (DE 23, ¶¶ 7-8).

    3.    Plaintiffs assert claims for: First Amendment restriction on speech against all Defendants except the City and the City (Counts I and II); First Amendment retaliation against all Defendants except the City and the City (Counts III and IV); Fourteenth Amendment substantive due process violation against the City (Count V); and Fourteenth Amendment procedural due process violation against eleven (11) individual FLPD officers and the City (Counts VI and VII).

    4.    As discussed in more detail in the below Memorandum of Law, Plaintiffs' Complaint should be dismissed because: (1) Plaintiffs fail to state a § 1983 claim against the City under a final policymaker; policy, practice, or custom; or failure to train theory; (2) Plaintiffs fail to state a § 1983 claim against the Supervising Officers, individually, and they are entitled to qualified immunity on the First Amendment and Fourteenth Amendment claims; (3) Plaintiffs have failed to state a Fourteenth Amendment substantive due process claim; and (4) Plaintiffs have not alleged a cognizable Fourteenth Amendment procedural due process claim.

## MEMORANDUM OF LAW

### I.    Standards for Pleading and Dismissal

    Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs must articulate "enough facts to

---

[1] The attorneys bringing this case filed a similar, non-class action case in this District against the City and many of the same FLPD officers, in which the plaintiff alleged she was struck in the face by a KIP fired by FLPD officer Eliezer Ramos (a Defendant here). *See generally Ratlieff v. City of Fort Lauderdale, et al.*, Case No. 22-cv-61029-RAR (S.D. Fla.). In that case, Judge Ruiz entered an order (DE 178, Sept. 4, 2024) granting summary judgment in the FLPD officers' favor on the § 1983 claims against them (the same ones asserted in this case) on the ground the officers are entitled to qualified immunity. Judge Ruiz also granted summary judgment to the City on the Fourteenth Amendment substantive and procedural due process claims and on *Monell* liability for the First Amendment claims except for the narrow, "so obvious"/"single incident" species of failure to train. (*Id.*).

state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556). When determining whether a claim has facial plausibility, "a court must view a complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1066 (11th Cir. 2007).

However, the Court need not take allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. "Mere labels and conclusions or a formulaic recitation of the elements of a cause of action will not do, and a plaintiff cannot rely on naked assertions devoid of further factual enhancement." *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013). "[I]f allegations are indeed more conclusory than factual, then the court does not have to assume their truth." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). Plaintiffs' Complaint must be dismissed if the facts alleged "have not nudged [its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## II.        Municipal Liability

Plaintiffs' § 1983 claims against the City for violation of her First Amendment (Counts II and IV) and Fourteenth Amendment (Counts V and VII) rights should be dismissed because they fail to state a basis for § 1983 liability against the City. No municipal liability exists under § 1983 absent an underlying constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Beshers v. Harrison*, 495 F.3d 1260, 1264 (11th Cir. 2007). Even if an underlying constitutional violation is present, a municipality may be liable under § 1983 only when the constitutional deprivation was undertaken pursuant to a policy or custom; respondeat superior is not an appropriate basis for suit. *Pembaur v. Cincinnati*, 475 U.S. 469, 478-81 (1986); *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 694 (1978). "[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur*, 475 U.S. at 480. The policy "must be the moving force of the constitutional violation" to impose municipal liability. *Gilmere v. City of Atlanta*, 737 F.2d 894, 901 (11th Cir. 1984).

### A.   Final Policymaker Theory

Plaintiffs rely in part on a "final policymaker" theory of *Monell* liability. (DE 23, ¶¶ 52-62). "[M]unicipal liability may attach to a single decision made by a municipal official if that municipal official is the final policymaker for the municipality with respect to the subject matter in question." *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989). In such an instance, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483.

Plaintiffs allege the FLPD Chief of Police is the final policymaker regarding FLPD policing and that the Chief Maglione: "authorized the deployment of KIPs and tear gas during the assembly"; "knew" they were deployed "to disperse the crowd" and "after Officer Hayes was no longer at the Parking Garage"; "knew less lethal weaponry was being deployed without warning or a dispersal order by subordinate FLPD officers"; "had the authority to stop the use of tear gas and kinetic impact projectiles from being deployed"; "had the means to contact officers at the Parking Garage"; and "gave no instructions to stop using tear gas, chemical munitions, and KIPs, and did not direct his subordinates to issue such orders." (DE 23, ¶¶ 52, 54-59). Plaintiffs further allege in conclusory fashion that "[f]inal *policymakers* within the City authorized and directed the deployment of less lethal munitions at demonstrators" at the subject intersection "in order to disperse the crowd." (*Id.*, ¶¶ 143, 160, 170; 195; *see also id.*, ¶ 166 (similar)) (emphasis added).

Plaintiffs' current Complaint indicates they are proceeding on a final policymaker "delegation" theory. (DE 23, p. 8; ¶¶ 60, 62, 146). They allege that "*FLPD* delegated authority to subordinates to exercise discretion when to deploy crowd control tactics against a demonstration" and that "[t]he decision to deploy force was not subject to supervision or review, except to the extent that those delegated the authority, in their sole and unsupervised discretion, deemed appropriate." (*Id.*, ¶¶ 60, 62) (emphasis added). However, Plaintiff alleges that the FLPD Chief of Police is the final policymaker for policies governing FLPD policing and that Maglione was the Chief of Police. (*Id.*, ¶¶ 52, 54). Plaintiff does *not* allege that *Chief Maglione* delegated policymaking authority to any subordinates of that any other officer was a final policymaker for FLPD policy.

As the Eleventh Circuit has noted, the "mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority." *Mandel*, 888 F.2d at 792. Liability attaches under a delegation theory only when "the subordinate's

discretionary decisions are not constrained by official policies and are not subject to review." *Id.* Plaintiffs' allegations in paragraphs 60 and 62 are conclusory and essentially just mirror the language in *Mandel*. Those conclusory allegations are unsupported by underlying factual allegations and are belied by other allegations in the Complaint, such as the allegations that the Chief of Police participated in major decisions via telephone (DE 23, ¶ 63), that FLPD has a policy regarding dispersal orders (*id.*, ¶¶ 70, 77), and that FLPD trained officers that dispersal orders were not necessary if bottles were thrown (*id.*, ¶¶ 71, 75). Plaintiffs have not pled facts establishing that any discretion exercised by subordinate officers was not subject to official policy or administrative review. In *Ratlieff*, at the pleading stage, Judge Ruiz dismissed the plaintiff's final policymaker claim based on similarly insufficient allegations. (*Ratlieff*, DE 93, pp. 28-31). This Court should likewise find that Plaintiffs have failed to state a claim under this theory of *Monell* liability.

Furthermore, Plaintiffs do not allege that Chief Maglione authorized or approved the deployment of tear gas that allegedly affected them and allegedly violated their First Amendment rights. They have thus not alleged facts establishing that Chief Maglione directed the specific subordinate actions that caused the Plaintiffs' claimed First Amendment violations, or delegated the authority to do so, for purposes of a *Monell* claim. Accordingly, Plaintiffs fail to state a § 1983 claim against the City based on a final policymaker/delegation theory.

### B. Policy, Practice, or Custom Regarding Dispersal Orders

As another putative basis for *Monell* liability, Plaintiffs allege that "[b]y policy, custom, and practice, FLPD does not give the dispersal orders required by law, even where it has the means and ability to give a dispersal order." (DE 23, ¶ 72). A custom has been defined as a "deeply imbedded traditional way[ ] of carrying out policy," *Fundiller v. Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985), or the tacit authorization or display of deliberate indifference towards police misconduct, *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) (citation omitted). However, "'[t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'" *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)). The "official policy or custom must be the moving force of the constitutional violation in order to establish liability of a government body under [Section] 1983." *Gilmere v. City of Atlanta*, 737 F.2d 894, 901 (11th Cir. 1984).

"To establish the existence of a custom, the plaintiff must show a longstanding and widespread practice." *Marantes v. Miami-Dade Cnty.*, 649 Fed. Appx. 665, 672 (11th Cir. 2016) (quoting *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011)) (cleaned up). Thus, "[a] single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees of the municipality." *Craig*, 643 F.3d at 1311 (alteration added). Rather, "considerably more proof than [a] single incident [is] necessary." *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985) (alterations added).

Here, Plaintiffs do not allege facts establishing that the City had a policy, custom, or widespread practice of not giving dispersal orders that was the moving force behind their alleged injuries. Plaintiffs contradict their allegation that such a policy existed by alleging that "FLPD's policy requires dispersal orders before making mass arrests, but *FLPD has no policy* governing the dispersal of an assembly determined to be unlawful, riotous, or tumultuous." (*Id.*, ¶ 70) (emphasis added). Plaintiffs also do not allege any widespread "custom" or "practice" of the FLPD not giving dispersal orders; instead they rely only on the subject incident. They do not point to any other prior instances of FLPD officers deploying less-lethal munitions to disperse an unlawful crowd in the absence of a dispersal order. Plaintiffs' allegations also ignore their allegations elsewhere that FLPD pre-recorded a dispersal order on a Long-Range Acoustic Device ("LRAD"), assigned an officer to the LRAD, brought the LRAD and dispersal order to the Parking Garage, and eventually issued a dispersal order. (*Id.*, ¶¶ 33, 73-74). Plaintiffs also acknowledge elsewhere that FLPD has a policy, 501.10, regarding dispersal orders. (*Id.*, ¶ 77). Such allegations contradict Plaintiffs' allegations regarding a policy, custom, or practice of *not giving* dispersal orders.

Plaintiffs allege that FLPD trained its officers that no dispersal orders were necessary when responding to a scene where bottles are being thrown and that the assigned officer did not turn on the LRAD's dispersal order upon his arrival at the parking garage based on his claimed training that dispersal orders were unnecessary if the police were responding to a scene where bottles were thrown. (*Id.*, ¶¶ 71, 75). However, failure to train is a theory distinct from an official policy or an unofficial custom or practice, and the failure to train theory is addressed below. Furthermore, in Count IV, Plaintiffs do not allege the existence of any policy, custom, or practice of not giving dispersal orders as the moving force behind the alleged constitutional violations (*id.*, ¶¶ 160-162), and the other counts against the City, the allegations regarding FLPD's policy against providing

dispersal orders being the "moving force" behind the alleged constitutional violations are merely conclusory (*see id.*, ¶¶ 145, 172, 198).

Plaintiffs have not cited any case that establishes that the failure to give a dispersal order under the circumstances alleged is *unconstitutional* (as opposed to an alleged violation of English common law or Florida statutory law). As Judge Ruiz noted in *Ratlieff*, even if FLPD "violated Florida law by failing to issue a dispersal order, this would still be insufficient for [plaintiffs] to travel under a *Monell* official-policy theory of liability." (*Ratlieff*, DE 178, p. 82 n.34).  Another district court determined in 2022 that no case provides that the failure to issue a dispersal order in the absence of arrests constitutes a *per se* constitutional violation. *See Puente v. City of Phoenix*, No. CV-18-02778-PHX-JJT, 2022 WL 357351, at *11 (D. Ariz. Feb. 7, 2022) (agreeing with defendants that the applicable case does *not* support the proposition that the First Amendment requires a dispersal order before police may disperse a crowd with chemical agents and stating that "[n]o case provides that a failure to issue a dispersal order in the absence of arrests constitutes a *per se* First Amendment violation, and the Court will not so declare here"). For the foregoing reasons, Plaintiffs fail to state a claim against the City under *Monell* based on a municipal policy, custom, or practice of failing to give a dispersal order.

### C. **Failure to Train**

Section 1983 liability for failure to train will be imposed on a municipality only where the municipality inadequately trains its employees, the failure to train "is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989)). Inadequate police training "may serve as the basis for § 1983 liability *only where* the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388 (emphasis added). To establish deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350. "[T]he identified deficiency" in a training program "must be closely related to the ultimate injury." *Harris*, 489 U.S. at 391.

Plaintiffs allege that FLPD trained officers that the target area for engaging subjects with 40mm KIPs includes the chest and that "[s]everal individuals assembled were struck in the face by police deployed KIPs." (DE 23, ¶¶ 43-44). However, Plaintiffs themselves only allege they

were affected by tear gas deployment; they do not allege they were struck or injured by a KIP.[2] (*Id.*, ¶ 50). Accordingly, the alleged failure to train with respect to KIP targeting or deployment (*see also id.*, ¶¶ 78-79, 83) was not "closely related to the ultimate injury," *Harris*, 489 U.S. at 391, is practically irrelevant, and could not have been the moving force behind the alleged constitutional injuries suffered by the party Plaintiffs, contrary to Plaintiffs' conclusory "moving force" allegations. (DE 23, ¶¶ 144, 161, 171, 196).

Plaintiffs' other allegations regarding failure to train are conclusory. In the "Failure to Train" allegations, Plaintiffs allege that: FLPD policy does not provide guidance to officers "when to make announcements of unlawful assemblies and dispersal orders absent the intent to make mass arrests as outlined in policy 501.10"; FLPD's department-wide Field Force training does not address how to deploy tear gas or KIPs "during a crowd control situation"; and FLPD's SWAT and field training course on 40mm launchers "does not address the use of tear gas and less lethal munitions specifically in crowd control situations." (DE 23, ¶¶ 77-79).  Plaintiffs do not allege facts establishing that the City knew of a need to train in these particular areas and made a deliberate choice not to take action. Plaintiffs reference only the subject incident, not any prior incident(s) that would have alerted the City of a need for training in these specific, particular areas.

Instead, Plaintiffs rely on unsubstantiated legal conclusions, offered as opinions by alleged "Police Practices Experts," that the need for training is "obvious" because the scenario of officers needing to deploy tear gas in a crowd control situation is "predictable." (*Id.*, ¶¶ 81-83) Such allegations are insufficient to state a claim based on a "so obvious" failure to train theory. *See Gold*, 151 F.3d at 1352 n.13 ("Gold presented expert testimony that the need for training and/or supervision in these two areas should have been obvious to the City and that the City was deliberately indifferent in not responding. However, an expert's conclusory testimony does not control this Court's legal analysis of whether any need to train and/or supervise was obvious enough to trigger municipal liability without any evidence of prior incidents putting the municipality on notice of that need.").

---

[2] This is a critical distinction between this case and *Ratlieff*, where the plaintiff was struck in the eye by an impact projectile. The alleged training deficiencies pertaining to KIP targeting and deployment that the Court found sufficient to preclude summary judgment in the City's favor on the failure-to-train theory in that case do not support Plaintiffs' claims in this case.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  As such, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (internal citations omitted). The standard for establishing liability under a failure-to-train theory presents Plaintiff with a "very difficult burden to satisfy." *Samarco v. Neumann*, 44 F. Supp. 2d 1276, 1287 (S.D. Fla. 1999). It will not suffice "to prove than an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Harris*, 489 U.S. at 391.

Plaintiffs have not alleged a single prior constitutional violation by untrained employees, much less a pattern of such violations, and Plaintiffs allegations in paragraphs 81 through 83 indicate that Plaintiffs are proceeding only under the narrow theory that "the need for training was ***so obvious*** that a municipality's failure to train its employees would result in a constitutional violation." *Mingo v. City of Mobile, Ala.*, 592 Fed. Appx. 793, 799-800 (11th Cir. 2014) (emphasis added); *see also Weiland v. Palm Beach Cnty.*, 792 F.3d 1313, 1329 (11th Cir. 2015) ("[E]vidence of previous incidents is not required to establish city policy if the need to train and supervise in a particular area is 'so obvious' that liability attaches for a ***single incident***.") (citation omitted) (emphasis added). This "so obvious"/ "single incident" species of failure-to-train liability is both exceedingly narrow and currently hypothetical in this Circuit. *See Gold*, 151 F.3d at 1352 ("In short, to date, the Supreme Court has given ***only a hypothetical example*** of a need to train being 'so obvious' without prior constitutional violations: the use of deadly force where firearms are provided to police officers.") (citing *Harris*, 489 U.S. at 390 n.10) (emphasis added); *Denham v. Corizon Health, Inc.*, 675 Fed. Appx. 935, 942 (11th Cir. 2017) ("***The Supreme Court has never determined that the need for 'more or different' training was obvious.***") (emphasis added).

In fact, neither the Supreme Court nor the Eleventh Circuit have ever actually determined that a need for additional training was "so obvious" that a municipality was liable on a failure-to-train theory based on a single incident. *See Vielma v. Gruler*, 808 Fed. Appx. 872, 882-84 (11th Cir. 2020) (affirming dismissal of claim arising out of police response to Pulse nightclub shooting based on "so obvious" theory, stating that "Plaintiffs do not allege the type of factual scenario

hypothesized by *Canton*"); *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (affirming summary judgment in favor of the school board and concluding that "[i]t is not obvious a teacher's aide would craft a sting operation like the one here in response to (1) the Board's allegedly inadequate training policies or (2) a policy requiring witnesses, physical evidence, or an admission of guilt before disciplining a student for sexual harassment."); *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1053 n.56 (11th Cir. 2014) ("Although the Supreme Court has left open the ***possibility*** that a single incident may prove sufficient to hold a supervisor liable for a failure to train … we decline to use this case as the vehicle for flushing out the Supreme Court's ***hypothetical basis*** for § 1983 relief.") (emphasis added); *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009) (finding that the need for training concerning the application of the hobble restraining device does not rise to a sufficient level of obviousness).

The Eleventh Circuit recently reversed the district court's denial of summary judgment in favor of a sheriff on a § 1983 claim resting solely on a "so obvious"/"single incident" *Monell* theory in *Chisesi v. Hunady*, No. 21-11700, 2024 WL 1638587 (11th Cir. Apr. 16, 2024). The court stated that although the evidence showed "the possibility of ***recurring situations*** involving those suffering mental health crises, the evidence is far more equivocal on whether there was ***an obvious potential for the violation of constitutional rights and an obvious need for more or different training***." *Id.* at *7 (emphasis added). The court concluded:

> While certainly important training topics—engaging with mentally ill individuals, handling barricaded subjects, and performing de-escalation techniques—*the failure to train officers in those areas does not "carry a high probability for constitutional violations in the manner intended by the 'so obvious' notice* that would open the door to [supervisor] liability." … Moreover, *we cannot say that Sheriff Mack knew to a moral certainty that constitutional violations would result from declining to further train* his deputies on engaging with individuals experiencing mental health crises. Thus, Sheriff Mack's failure to train sheriff deputies in these areas falls outside *the limited circumstances that the Supreme Court has hypothesized could give rise to single-incident liability for failure to train*.

*Id.* (emphasis added). Here, Plaintiffs allege only the possibility of *"predictable" (not even recurring) situations*; but they do not allege facts demonstrating that the failure to train in the particular areas carried a *high probability for constitutional violations* or that the City "knew to a moral certainty that constitutional violations would result" from a failure to train in those areas.

Plaintiffs' allegations do not establish that the need to train officers in the alleged respects was so obvious that it would trigger municipal liability without any evidence of prior incidents

putting the City on notice of the need for additional training. At least one federal court has found that the failure to train officers specifically on the use of impact weapons in crowd control situations was insufficient to impose municipal liability. *See Johnson v. City of San Jose*, No. 21-CV-01849-BLF, 2023 WL 7513670, at *15 (N.D. Cal. Nov. 11, 2023) (granting summary judgment on plaintiff's claim that the city failed to train its officers "in the use of PIWs in crowd control circumstances," stating that "the inquiry is not one based on hindsight," and concluding that there was no indication of either a prior recognition of inadequate training based on a pattern of constitutional violations or circumstances under which a likely constitutional violation was so obvious that failure to do more constitutes a policy of deliberate indifference). *See also Rusanowsky v. City of Dallas*, No. 3:22-CV-01132-K, 2023 WL 2728722, at *7 (N.D. Tex. Mar. 30, 2023) (dismissing the plaintiff's failure-to-train claim and rejecting the plaintiff's attempt to plead a "single incident" theory that the purported constitutional violations he endured were a highly predictable consequence of the city's failure to train its officers in protest management); *Sanderlin v. City of San Jose*, No. 20-CV-04824-BLF, 2023 WL 2562400, at *22-24 (N.D. Cal. Mar. 16, 2023) (granting summary judgment in city's favor on failure-to-train theory).

In *Vielma*, the Eleventh Circuit quoted with apparent approval the district court's order concluding that the plaintiffs did not plausibly allege that the city's failure to train officers on how to enter public places and neutralize an active shooter fit within the narrow range of "single incident" liability. 808 Fed. Appx. at 882. The Eleventh Circuit quoted with approval the district court's statement that "***[t]he incredibly specific training envisioned by Plaintiffs*** on responding and *neutralizing* a hypothetical active shooter without violating anyone's constitutional rights ***bears no resemblance*** to the use-of-deadly-force training envisioned in *Canton*." *Id.* at 883 (internal quotation marks omitted) (emphasis added). The same is true of the incredibly specific training envisioned by the Plaintiffs in this case. For the foregoing reasons, Plaintiffs' § 1983 claims against the City in Counts II, IV, V, and VII should be dismissed for failure to state a claim to the extent they are based on an alleged failure to train.

### III.   <u>Qualified Immunity on First Amendment Claims</u>

Plaintiffs assert § 1983 claims under the First Amendment against the Supervising Officers, individually, in Counts I and III. "It is well established that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or respondeat superior." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). "However, supervisors are liable under § 1983

'either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'" *Id.* (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)).

"A causal connection can be established by, *inter alia*, 'facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Id.* (quoting *Gonzalez*, 325 F.3d at 1235). The "standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, 325 F.3d at 1234 (cleaned up). A failure-to-stop claim under a supervisory liability theory "requires that the supervisor (1) have the ability to prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the constitutional violation, and (2) subsequently fails to exercise that authority to stop it." *Keating*, 598 F.3d at 765.

However, even if Plaintiffs allege cognizable First Amendment claims against the Supervising Officers (which they deny), they are entitled to qualified immunity. "Qualified immunity protects municipal officers from liability in § 1983 actions as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009) (quotation omitted). To be eligible for qualified immunity, the official must show he was engaged in a "discretionary function" when he committed the allegedly unlawful act. *Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004). Once this burden is met, it "shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted). To avoid qualified immunity, the plaintiff must then satisfy a two-prong test, showing: (1) the defendant violated a constitutional right; and (2) this right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

To establish the challenged actions were within the scope of the Supervising Officers' discretionary authority, they must show such actions were undertaken pursuant to the performance of their duties, and within the scope of their authority. *Harbert Int'l v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). To that end, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.* (cleaned up). Here, the allegations demonstrate that the Supervising Officers acted within their discretionary authority in allegedly authorizing the deployment of tear gas and impact

projectiles, because such actions, "if done for a proper purpose," would be within, or reasonably related to, their duties as supervising police officers.

Therefore, "the burden shifts to the plaintiff[s] to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). That is, Plaintiffs must show that each of the five (5) Supervising Officers violated a constitutional right and that the right was clearly established at the time of the violation. *See Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018) (Courts "must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged."). Plaintiffs have not met this burden. Plaintiffs cannot demonstrate that the Supervising Officers violated a right that was clearly established at the time.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "[T]he clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). Courts are "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (cleaned up). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 1153. "Unless a government agent's act is so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Lassiter v. Ala. A&M Univ., Bd. of Trs.*, 28 F.3d 1146, 1149 (11th Cir. 1994). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (cleaned up). "[A] police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful *in light of clearly established law and information possessed by the officer at the time the conduct occurred*." *Id.* (emphasis added).

Plaintiffs allege that MacDoughall and Greenlaw (who are no longer named Defendants) "monitored" the police response remotely at the off-site Real-Time Crime Center via police radio and television coverage and that Chief Maglione, who was also off-site, communicated to the "monitoring group" via telephone. (DE 23, ¶ 63). Plaintiffs allege that those individuals as well as Dietrich, Figueras, Cristafaro, and Steven Smith "had supervisory authority over the FLPD officers

who deployed chemical munitions and KIPs near" the subject intersection. (*Id.*, ¶ 64). Plaintiffs assert that these Supervising Officers "knew" that tear gas and KIPs were being deployed, that the assembly was being dispersed with tear gas and KIPs, and that no warning or dispersal order was given before the deployments. (*Id.*, ¶ 65). Plaintiffs allege that the Supervising Officers had the authority and ability to stop the deployment of tear gas and KIPs but failed to do so. (*Id.*, ¶ 67). Plaintiffs further allege that Maglione, Greenlaw (no longer a party), Dietrich, and Figueras "provided authorization for the deployment of tear gas and KIPs," and that Figueras, Cristafaro, and Steven Smith "gave on-scene command to deploy tear gas and KIPs against demonstrators." (*Id.*, ¶¶ 68-69).[3] Plaintiffs' allegations about the Supervisory Officials in the substantive counts (*Id.*, ¶¶ 140, 157) are pure conclusions of law reciting the elements of a supervisory liability claim and are not entitled to the assumption of truth on a Rule 12(b)(6) motion. *Iqbal*, 556 U.S. at 663.

Based on Plaintiffs' allegations, Maglione was an off-site supervising officer who was not physically present at the subject intersection when the alleged First Amendment violations occurred, did not personally participate in the alleged violations, did not direct subordinates to deploy tear gas or KIPs, and had no reason to know that subordinates were acting unlawfully based on the information being relayed to him. Accordingly, Plaintiffs have not established the requisite "causal connection between actions of the supervising official and the alleged constitutional violation." *See Keating*, 598 F.3d at 762. Accordingly, Maglione, as an off-site supervisor, cannot be held liable for alleged violations of Plaintiffs' First Amendment rights under a § 1983 supervisory liability theory as a matter of law. This is the same conclusion that Judge Ruiz reached on these claims against Maglione (and other off-site supervisors) in *Ratlieff*. (DE 178, pp.65-68).

Maglione, as an off-site Supervising Officer, is also entitled to qualified immunity, as *Keating* would not have put him on fair notice that his alleged conduct violated Plaintiffs' constitutional rights. In *Keating*, the protestors alleged that the supervisory officers were "authorized decisionmakers *present on the scene*" and "*witnessed, condoned, and directed*" the

---

[3] Plaintiffs allege that Cristafaro, among SWAT Team Members, "deployed chemical munitions … at or near the corner" of the intersection "with an intent to disperse the crowd" and that Steven Smith "deployed NFDDs [Noise Flash Diversionary Devices] at or near the corner" of the intersection "with an intent to disperse the crowd. (DE 23, ¶¶ 85, 89, 106). However, Plaintiffs do not allege they were affected by the tear gas allegedly deployed "at or near" the intersection or by the NFDDs allegedly deployed by Steven Smith "at or near" the intersection or even that Plaintiffs were present when such deployments occurred. Accordingly, such alleged deployments do not support constitutional claims against Cristafaro and Steven Smith, individually.

allegedly unconstitutional acts. 598 F.3d at 758, 763 (emphasis added). They alleged that when they were assaulted, two of the officers were standing less than 100 feet from the skirmish line "with an unrestricted view" of the "herding" of demonstrators and discharge of projectiles and tear gas" and that "at the precise time they were assaulted," the other two officers were close to the rear of the skirmish line "with an unrestricted view" of the "herding" of demonstrators and discharge of projectiles and tear gas, but that the officers "failed to stop the police action." *Id.* at 764. They alleged the police chief "approved orders permitting the police line to advance while beating unarmed demonstrators and discharging projectiles and tear gas," the deputy chief and second in command "made the decision to utilize 'herding techniques' to corral the demonstrators by personally directing the police lines to march northward," and a captain "directed the police lines to begin discharging weapons at the unarmed demonstrators." *Id.* at 763. Such alleged facts are a far cry from the facts alleged in this case as to Maglione and other off-site Supervising Officers.

Plaintiffs allege that the on-site Supervising Officers other than Dietrich (Figueras, Cristafaro, and Steven Smith) "gave on-scene command to deploy tear gas and KIPs against demonstrators" (DE 23, ¶ 69), but Plaintiffs were not struck by KIPs. And they do not allege when and where the commands to deploy tear gas were given (either generally or in relation to their presence and exposure to tear gas), the particular circumstances at the intersection or what each of these Supervising Officers observed/knew at the time such commands were given, or that Plaintiffs themselves were affected by tear gas deployed *in response to commands from these Supervising Officers*. Plaintiffs have not alleged "facts which support an inference that the supervisor[s] directed the subordinates *to act unlawfully* or knew that the subordinates *would act unlawfully* and failed to stop them from doing so." *Keating*, 598 F.3d at 762 (cleaned up) (emphasis added).

Moreover, in *Ratlieff*, Judge Ruiz concluded that on-site Supervising Officers Dietrich, Cristafaro, and Figueras[4] were entitled to qualified immunity because the plaintiff failed to show that their conduct violated her clearly established First Amendment rights. (DE 178, pp. 72-76). There, the plaintiff relied primarily on *Keating* (which Plaintiffs do not even cite in their Complaint in this case), but the Court determined that *Keating* "does not suffice to invoke a broader clearly established principle that should control the novel facts of this case." (*Id.*, p. 74). The Court noted that *Keating* would not have put the on-site Supervising Officers on notice that police supervisors

---

[4] Steven Smith was previously a Defendant in *Ratlieff* but dismissed prior to summary judgment.

violate a person's First Amendment rights when they order or fail to stop their subordinates from deploying tear gas and KIPs into a crowd where some individuals in that crowd are throwing objects directly at police" (*id.*, p. 76), as Plaintiffs in this case have acknowledged "some crowd members" did. (DE 23, ¶ 15). Here, as in *Ratlieff*, the on-site Supervising Officers are entitled to qualified immunity on Plaintiffs' First Amendment claims in Counts I and III.

### IV.    Fourteenth Amendment Substantive Due Process

Plaintiffs purport to assert a Fourteenth Amendment substantive due process claim against the City in Count V, alleging that FLPD's "indiscriminate" deployment of tear gas and less-lethal munitions against crowds that included peaceful demonstrators constituted "excessive force" and "was conscious-shocking, malicious, sadistic, and/or objectively unreasonable." (DE 23, ¶¶ 166-169). In *Ratlieff*, Judge Ruiz granted summary judgment in the City's favor on that plaintiff's Fourteenth Amendment substantive due process claims on essentially the same facts. (*Ratlieff*, DE 178, pp. 45-50). Here, Plaintiffs have failed to state a substantive due process claim against the City, as the facts alleged are insufficient to establish that the City's conduct was sufficiently arbitrary or conscious-shocking to sustain such a claim.

"Officials acting under color of state law violate the substantive component of the Due Process Clause only when their conduct 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Peterson v. Baker*, 504 F.3d 1331, 1336 (11th Cir. 2007) (per curiam) (citation omitted). However, "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). "Section 1983 must not be used as a font of tort law to convert state tort claims into federal causes of action." *Peterson*, 504 F.3d at 1336 (citation and quotation marks omitted). "[E]ven intentional wrongs seldom violate the Due Process Clause." *Id.* (citation and quotation marks omitted). "Because the Constitution is not a font of tort law, it is not breached unless the offending forceful conduct is truly arbitrary, egregious, or conscious-shocking." *Peterson*, 504 F.3d at 1340. Conscience-shocking behavior is likely to be found where the "conduct [is] intended to injure in some way *unjustifiable by any government interest*." *Lewis*, 523 U.S. at 849 (emphasis added).

To state a substantive due process claim, Plaintiffs must allege facts evincing conduct that can be characterized as "conscious-shocking in a constitutional sense." *Davis v. Carter*, 555 F.3d 979, 982 (11th Cir. 2009). Here, the alleged facts do not establish that the deployment of tear gas

and impact projectiles under the totality of the circumstances was "so brutal or inhumane as to shock the judicial conscience." *Peterson*, 504 F.3d at 1340; *see also Lewis*, 523 U.S. at 855 ("Regardless whether Smith's behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and petitioners are not called upon to answer for it under § 1983."). In analyzing a similar injury in the less stringent Fourth Amendment context, the Eleventh Circuit held that a plaintiff's "incidental exposure to pepper fumes for a short period of time is not a sufficient basis to state an excessive force claim." *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1191 (11th Cir. 2011).

As Judge Ruiz noted in *Ratlieff*, "at least one other court in this district has explicitly rejected the notion that officers' use of less-lethal weapons to control a protest could rise to the level of conscience shocking sufficient to sustain a § 1983 substantive due process claim." (*Ratlieff*, DE 178, pp. 49-50) (citing *AFL-CIO v. City of Miami*, No. 07-22966-CIV-UNGARO, 2008 WL 11333331, at *6 (S.D. Fla. Sept. 4, 2008) (concluding that police officers' use of less-than-lethal weapons, denial of plaintiffs' access to their property, and detention of plaintiffs and other protestors at gunpoint in the context of attempting to control a protest march "cannot be said to shock the Court's conscience" and, thus, "do not meet the standard for a Fourteenth Amendment substantive due process violation")); *see also Redd v. City of Evansville, Ind.*, No. 3:12-cv-00070-RLY-WGH, 2014 WL 2439701, at *7-8 (S.D. Ind. May 30, 2014) (plaintiff's excessive force claim based on allegations centering around officer's negligent use of pepper spray to disperse crowd were "insufficient to give rise to a substantive due process claim").

The Eleventh Circuit has found that facts more egregious than those alleged here were not "conscious-shocking" in a constitutional sense. *See, e.g., McCants v. City of Mobile*, 752 Fed. Appx. 744, 749 (11 Cir. 2018) (holding that officer's alleged conduct towards mother at scene of her daughter's automobile accident, yelling at and punching her in the chest, did not shock the conscience, as required to state a substantive due process claim); *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (military college instructor who slammed classroom door in student's face, resulting in student's arm becoming lodged in shattered glass window pane, and then violently swung the door several times in an attempt to knock plaintiff back from the door, and finally shoved her in the face, trying to forcibly dislodge her arm from the window, did not deprive her of substantive due process).

In *McCray v. Howard*, 285 Fed. Appx. 689 (11th Cir. 2008), the court affirmed dismissal of a claim that was construed as a Fourteenth Amendment substantive due process claim, where the plaintiff (a courtroom deputy) alleged she was struck on her shoulder and chest by the defendant (the district attorney) resulting in injuries that required her to go to the emergency room and seek further treatment from a specialist for her shoulder and rotator cuff. *Id.* at 690-91. The court concluded that as in *Dacosta*, the complaint alleged conduct that "if true, is unbecoming of a public official and may potentially constitute an intentional tort such as battery under state law. However, under governing precedent, this alleged conduct fails to rise to the level of 'conscience-shocking' so as to state a claim of substantive due process." *Id.* at 693 (citing *Dacosta*, 304 F.3d at 1049 ("Remedies for batteries of this sort should be pursued in accordance with state law."). Based on all the foregoing, Plaintiffs' Fourteenth Amendment substantive due process claim against the City should be dismissed for failure to state a claim upon which relief can be granted.

The claim should also be dismissed because there is no basis for *Monell* liability where there is no underlying constitutional violation and because Plaintiffs have not pled a basis for *Monell* liability on the Fourteenth Amendment substantive due process claim for the reasons discussed above in Section II.

## V.      Fourteenth Amendment Procedural Due Process

### A.  THE PROCEDURAL DUE PROCESS CLAIMS ARE MISPLACED AND FAIL AS A MATTER OF LAW.

Plaintiffs attempt to assert claims against the Supervising Officers and some of the Individual Officers (Count VI) and the City (Count VII) for violation of their Fourteenth Amendment procedural due process rights. However, Plaintiffs have failed to state a cognizable procedural due process claim.

#### i.   Non-Supervising Officers

The Due Process Clause of the Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend XIV, §1. While the Due Process Clause protects both substantive and procedural rights, the claim pled here is one for Procedural Due Process only. Here, Count VI seeks relief against these individual defendants because they utilized less-lethal force options prior to the City issuing a dispersal order. The instant movants were not responsible for the dispersal order. *See*, Count VI, DE 23, ¶¶174-193.

This claim has already met with resounding defeat in *Ratlieff,* the companion case to this involving the same attorneys, wherein In that action, Judge Ruiz explained that this claim focuses not on whether act of deprivation itself is unconstitutional, but whether "what is unconstitutional is the deprivation of such an interest *without due process of law." Ratlieff,* DE 178, p. 42 (citing, *Zinernon v. Burch*, 494 U.S. 113, 125 (1990)). Thus, a section 1983 claim alleging a denial of due process must show: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Id.* at p. 43 (citing, *Arrington v. Helms*, 438 F.3d 1336, 1347-48 (11th Cir. 2006)).

In rejecting the same claims made here, Judge Ruiz noted that the plaintiff could not provide any authority for the "novel proposition that the Fourteenth Amendment's Due Process Clause entitles her to notice and opportunity *to disperse* in the context of a class between protestors and police." *Id.* (emphasis in original). Moreover, since there was an ability to maintain an actionable First Amendment claim based upon the same facts, she could not simultaneously sustain a procedural due process claim. *Id.* (citing, *Cotriss v. City of Roswell,* No. 16-4589, 2018 WL 11350388, at *3 (N.D. Ga, March 9, 2018).

Judge Ruiz also rejected the claim because Florida law and City policy related to dispersal orders do not establish an independent liberty interest sufficient to support a cognizable procedural due process claim. *Id.* at 44 (Citing, *Smith v. City of Minneapolis*, No. 21-1347, 2021 WL 6011029, at *2 (D. Minn. Dec. 20, 2021))(dismissing procedural due process claim in part because plaintiff "provide[d] no support for her argument that" a state law "detail[ing] how a peace officer may conduct an arrest" granted her "an independent liberty interest").

But all that aside, what dealt the death knell to the novel theory is that the plaintiff in that case, like the Plaintiffs here, have and had Constitutionally adequate process. *Id.*; *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994). They have pursued claims in federal court (instead of state court), and there can be no showing regarding the inadequacy of Florida process to remedy every conceivable alleged deprivation of liberty. Thus, there can be no satisfaction of the third element of a procedural due process claim regarding adequate process. *Id.* (citing, *See Young v. Akal*, 985 F. Supp. 2d 785, 804 (W.D. La. 2013) ("[I]t is clear a claim of deprivation of procedural due process cannot proceed, because the plaintiffs have adequate post-deprivation state tort remedies to pursue a recovery for their alleged injuries, that is, plaintiffs may bring state tort actions against the deputies in question to attempt to recover for the injuries they allege.");

*Ellsworth v. City of Lansing*, 34 F. Supp. 2d 571, 579–80 (W.D. Mich. 1998) (finding demonstrators' procedural due process claim based on their alleged entitlement to some form of notice or process prior to the release of tear gas "barred" because they failed to prove the inadequacy of state post-deprivation remedies); *McKinney*, 20 F.3d at 1563 (holding that, in the context of a property deprivation, a plaintiff has not suffered a violation of his or her procedural due process rights unless and until the State of Florida refuses to make available a sufficient means to remedy the deprivation).

In sum, the *Ratlieff* court fully accepted the legal arguments advanced by the Defendants concerning the viability of a procedural due process claim under circumstances virtually identical to those presented here. While the *Ratlieff* Order is based upon a Rule 56, rather than Rule 12 motion, no development of the record is needed when the claim, as pled, plainly fails to invoke a cognizable legal theory under the Constitution. Count VI should be dismissed with prejudice since, at a minimum, there was a constitutionally adequate state process as a matter of law.

### ii.   City and Supervising Officers

Procedural due process entitles individuals to "notice and the opportunity to be heard incident to the deprivation of life, liberty or property at the hands of the government." *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1316 (11th Cir. 2011) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)). Under this theory, it is not the deprivation itself that is unconstitutional; rather, "what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon,* 494 U.S. at 125 (1990)(emphasis added).

Plaintiffs' procedural due process claim fails to state a claim for three reasons. First, as to the threshold requirement of a *constitutionally protected* property or liberty interest, Plaintiffs' allegations fail to establish such an interest. As Judge Ruiz explained in *Ratlieff*, the notion that the Fourteenth Amendment's Due Process Clause entitles Plaintiffs to notice and an opportunity *to disperse* in the context of a clash between protestors and police is a "novel proposition." (*See* DE 93, p. 25; DE 178, p. 43). As he further noted, Plaintiffs' ability to state a procedural due process claim under § 1983 "is questionable" given that they have simultaneously advanced § 1983 claims under the First Amendment based upon the identical factual predicate. *Id.* (citing *Cotriss v. City of Roswell*, No. 16-4589, 2018 WL 11350388, at *3 (N.D. Ga. Mar. 9, 2018) (noting plaintiff "has provided no case law to support her contention that a deprivation of First Amendment rights

can also support a due process claim, whether procedural or substantive" and accordingly denying leave to file an amended complaint seeking to bring both a First Amendment free speech claim and Fourteenth Amendment due process claim under § 1983).

Second, to the extent Plaintiffs allege that Florida law and FLPD Policy related to dispersal orders establish an independent liberty interest sufficient to support a cognizable procedural due process claim under § 1983, such allegations fail to state a claim. (*Cf. Ratlieff*, DE 178, p. 44). Plaintiffs do not allege or explain why such laws or policies establish an independent liberty interest protected by the Due Process Clause. *See, e.g.*, *Smith v. City of Minneapolis*, No. 21-1347, 2021 WL 6011029, at *2 (D. Minn. Dec. 20, 2021) (dismissing procedural due process claim in part because plaintiff "provide[d] no support for her argument that" a state law "detail[ing] how a peace officer may conduct an arrest" granted her "an independent liberty interest").

Third, and most importantly, Plaintiffs have failed to allege the element of constitutionally inadequate process. "[A] procedural due process violation is not complete 'unless and until the State fails to provide due process.'" *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (quoting *Zinermon*, 494 U.S. at 123). Moreover, even where due process is initially lacking, however, "the state may cure . . . [that] deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *McKinney*, 20 F.3d at 1557.

Here, Plaintiffs fail to allege facts establishing that the procedures for remedying any alleged deprivations of their rights allegedly caused by being tear gassed or struck with an impact projectile without prior warning or a dispersal order were inadequate or unavailable under Florida law. Plaintiffs' conclusory assertions in paragraphs 187 through 189 that there was no adequate remedy at state law are insufficient to state a procedural due process claim. Plaintiffs do not assert any state law claims in this case, although in *Ratlieff*, the plaintiff asserted state law battery and negligence claims against the same Defendants based on the same underlying conduct. Here, Plaintiffs could have brought similar claims, and the availability of such post-deprivation common law and tort remedies satisfies Plaintiffs' procedural due process rights under the Fourteenth Amendment. *See Rowe v. City of Fort Lauderdale*, 8 F. Supp. 2d 1369, 1374 (S.D. Fla. 1998); *Peterson v. Scott*, No. 2:14-CV-420-FTM-38CM, 2015 WL 3935376, at *3 (M.D. Fla. June 26, 2015) ("Additionally, Florida law provides an adequate remedy for plaintiff because plaintiff could pursue a common law tort cause of action … .").

21

Thus, even if Plaintiffs could demonstrate a cognizable deprivation of their liberty interests, their procedural due process claims would still fail due to the availability of post-deprivation remedies, including state law tort claims. Other district courts have applied the same post-deprivation remedy analysis in cases involving similar factual circumstances. In *Young v. Akal*, 985 F. Supp. 2d 785 (W.D. La. 2013), for example, a plaintiff homeowner asserted § 1983 claims against the sheriff and a police officer, alleging that she and her children sustained injuries to their lungs and eyes after coming into contact with tear gas that had been deployed outside their home to disperse an unruly crowd that was blocking a public roadway. The court determined that to the extent the plaintiffs alleged a procedural due process claim, such a claim was not cognizable under § 1983 and could not proceed because the plaintiffs had adequate post-deprivation state tort remedies to seek recovery for their injuries. *Id.* at 804. *See also Ellsworth v. City of Lansing*, 34 F. Supp. 2d 571, 579-80 (W.D. Mich. 1998) (holding demonstrators' procedural due process claim based on their alleged entitlement to some sort of notice or process prior to the release of tear gas "is barred" because plaintiffs failed to prove the inadequacy of state post-deprivation remedies).

Therefore, Plaintiffs' procedural due process claims in Counts VI and VII should be dismissed for failure to state a claim. The claim against the City (Count VII) should be dismissed for the additional reasons that there is no basis for *Monell* liability since there is no underlying constitutional violation and that Plaintiffs have not pled a basis for *Monell* liability.

The Fourteenth Amendment claim against the Supervising Officers in Count VI should be dismissed, with prejudice, because the officers are entitled to qualified immunity as to that claim. The Supervising Officers were acting within their discretionary authority, so Plaintiffs must show they are not entitled to qualified immunity. *See Lee*, 284 F.3d at 1194. Plaintiffs cannot meet this burden, as Defendants have demonstrated they did not violate Plaintiffs' Fourteenth Amendment rights. Accordingly, the FLPD officers are entitled to qualified immunity. Even if the Supervising Officers violated Plaintiffs' Fourteenth Amendment rights, such rights were not clearly established at the time. Plaintiffs have not pointed to any case law that would give fair notice to the Supervising Officers that their alleged conduct violated Plaintiffs' Fourteenth Amendment due process rights.

## <u>CONCLUSION</u>

WHEREFORE, Defendants, City of Fort Lauderdale, Supervising Officers and the Non-Supervising Officers, respectfully request that this Honorable Court grant this combined Motion,

dismiss Plaintiffs' First Amended Class Action Complaint against each of them (DE 23), and provide any further relief the Court deems just and appropriate.

Respectfully submitted this 2nd day of May, 2025.

/s/ Jeffery R. Lawley
Jeffery R. Lawley, Esq.
Florida Bar No. 0596027
Email: jrl@bclmr.com
BILLING, COCHRAN, LYLES,
    MAURO & RAMSEY, P.A.
Las Olas Square, Suite 600
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
Tel: 954-764-7150
Fax: 954-764-7279
**Attorneys for Defendants, City of Fort Lauderdale,
Rick Maglione, Robert Dietrich, Avery Figueras,
Paul Cristafaro and Steven Smith**

JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, P.A.
**Attorneys for Defendants Rezaie, Baro, Burdick,
Caldera, Chatman, Dupree, Fernandez, Ijames,
Gottstein, Jenkins, Ketchmark, Magno, Ramos, F.
Smith, R. Smith, Soika, Walters**
2455 East Sunrise Blvd., Suite 1000
Fort Lauderdale, Florida 33304
Tel: 954.463.0100
Fax: 954.463.2444
Alexander@jambg.com
Cintron@jambg.com Andrews@jambg.com

/s/ Scott D. Alexander
Scott D. Alexander, Esq.
Fla. Bar No. 057207

I HEREBY CERTIFY that on this 2nd day of May, 2025, I electronically filed a true and correct copy of the foregoing with the Clerk of the Southern District of Florida, by using the CM/ECF system.

By: /s/ Jeffery R. Lawley
Jeffery R. Lawley, Esq.
Fla. Bar No. 0596027
jrl@bclmr.com

23