UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cv-60935-SMITH

JAYANNA JACKSON, *et. al.*,

      Plaintiffs,

v.

CITY OF FORT LAUDERDALE*, et al.,*

      Defendants.

_____/

## OMNIBUS ORDER

This matter is before the Court on Defendants' Combined Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (the "Motion to Dismiss") [DE 51], Plaintiffs' Response [DE 52], and Defendants' Reply [DE 53]. Also, before the Court is Plaintiffs' Motion for Class Certification ("Motion to Certify Class") [DE 64], Defendants' Response [DE 67] and Plaintiffs' Reply [DE 70]. The Court will first address the Motion to Dismiss and then the Motion for Class Certification. For the reasons that follow, the Motion to Dismiss is granted and the Motion for Class Certification is denied.

## I.     ALLEGATIONS IN THE FIRST AMENDED COMPLAINT[1]

Plaintiffs allege that on May 31, 2020, hundreds of law-abiding citizens gathered peacefully at the FAU Parking Garage in Fort Lauderdale, Broward County, Florida, to demonstrate against police brutality following the highly publicized police-murder of George Floyd. The Fort Lauderdale Police Department (FLPD) dispersed this assembly using tear gas and kinetic impact projectiles (KIPs) without providing any warning or formal dispersal order. The police action was motivated by disagreement with the demonstrators' message and their decision to assemble, rendering the police response unconstitutional.

---

[1] The class action allegations are addressed in a separate section below.

The named Plaintiffs in this action are residents of South Florida. Jayanna Jackson and Mike Gabelus were, at the time of the incident, residents of Broward County, Florida. Scott Ross was a resident of Miami-Dade County, Florida. On May 31, 2020, Plaintiffs, Jayanna Jackson and Mike Gabelus actively participated in the Fort Lauderdale assembly for justice, engaging in peaceful protest against police brutality at the FAU Parking Garage. Plaintiff Scott Ross attended the assembly to observe and record the proceedings. Throughout the assembly, none of the representative Plaintiffs threw objects, engaged in violence, or acted unlawfully in any manner. Rather, they exercised their constitutional right to peaceably assemble and protest. Without any prior warning, Plaintiffs claim they were struck with tear gas, which forced them to cease their lawful and peaceful assembly, protest, and observation activities.

The City of Fort Lauderdale (the "City") is a municipal government corporation and public entity organized under Florida law and was the employer of all officer defendants during the events at issue. The Fort Lauderdale Police Department ("FLPD") operates as a department within the City. At all times relevant to the First Amended Complaint (the "FAC"), the nineteen individual officer defendants—Rick Maglione, Robert Deitrich, Avery Figueras, S Paul Cristafaro, Steven Smith, Zachary Baro, Cameron Burdick, Jan Caldera, Jamie Chatman, Jesus Fernandez, Andrew Gottstein, Jeffrey Jenkins, Raymond Ketchmark, Ronald Magno, Remy Rodriguez, Eliezer Ramos, Robert Smith, David Soika, and Sean Walters—were duly authorized employees of the City and the FLPD and held valid licenses as police officers within the State of Florida.

Following the conclusion of a Black Lives Matter march at Huizenga Park, participants continued their peaceful assembly on SE 1st Avenue, a street designated for their use. At the intersection of SE 2nd Street and SE 1st Avenue, participants began chanting and displaying signs to Officer Hayes, one of two officers present at the corner who were blocking traffic to facilitate the demonstrators' activities. Officer Hayes falsely reported over the police radio that

2

a crowd had surrounded her vehicle and that individuals were "jumping on" her vehicle. Despite being outnumbered, Officer Hayes was never under attack or threat of attack, and no witness observed her being attacked. Following the arrival of additional police units, Officer Hayes exited her vehicle and engaged in conversation with one of the demonstrators.

The FLPD Field Force team and SWAT personnel responded to Officer Hayes' location to disperse the crowd; yet it was the police presence in riot gear, the sounds of deployed force, and the excessive use of force at a march against excessive force that attracted demonstrators and provided reason for continued demonstration. Officer Steven Pohorence was among those who responded and, despite observing no misconduct or violence, pushed into the peaceful crowd that was sufficiently distant from Officer Hayes. At approximately 6:52:07 p.m., Pohorence used force against a law-abiding demonstrator who was kneeling, thereby agitating the crowd. In response to this police-initiated force, some crowd members threw water bottles at Officer Pohorence. The two other motorman officers present in the crowd with Pohorence were not targeted with water bottles. The City has conceded that the first act of violence toward a Fort Lauderdale Police Officer at this location occurred only after Pohorence pushed the kneeling demonstrator.

After Officer Pohorence was quickly removed from the intersection, the situation was resolved within ten seconds by 6:52:17 p.m., and the crowd resumed its peaceful assembly as FLPD continued its dispersal efforts. At 6:52:56 p.m., multiple officers were warned to don gas masks, yet no warning was communicated to the assembly. At 6:54:39 p.m., officers west of the garage were advised via radio to leave the area because tear gas would be deployed from the east. This critical warning was not provided to the assembled demonstrators. Without declaring the assembly unlawful pursuant to Florida Statutes, Section 870.04 and without issuing a formal dispersal order, FLPD deployed tear gas and kinetic impact projectiles at

6:55:08 p.m. against the assembled demonstrators. The curfew had not yet taken effect, and the City had neither revoked permission to use the public space nor issued a dispersal order.

At 6:55:08 p.m., FLPD deployed indiscriminate force against demonstrators lawfully assembled at the parking garage, using tear gas and kinetic impact projectiles to disperse the entire assembly without distinguishing between peaceful protesters and any individuals who may have engaged in isolated misconduct. By treating the assembly as a single unit, FLPD lumped the vast majority of nonviolent demonstrators with a small fraction of individuals whose episodic responses were themselves reactions to police deployment of force. The decisions to deploy force were directly influenced by the Plaintiffs' and class members' exercise of their constitutional rights to peaceably assemble, protest, and observe, as well as by the substance of their speech.

Although each FLPD officer performed different tactical roles, all worked collectively toward a unified objective of clearing SE 2nd Street and SE 1st Avenue of all assembled persons. At approximately 7:01 p.m., the Field Force Team, headed by Captain Deitrich, formed a scrimmage line. FLPD's purpose was to disperse the assembly. As officers dispersed the crowd, they provided real-time updates to the Police Command Center regarding the crowd's diminishing size. After deploying less lethal munitions for more than one hour, FLPD issued a dispersal order at 7:57 p.m., providing demonstrators with ten minutes to leave. The remaining demonstrators immediately began dispersing upon hearing the order, with many fleeing the police force. Once the Field Force Team departed the area, no individuals remained assembled at the Parking Garage.

On May 31, 2020, FLPD deployed a total of 205 chemical munitions and kinetic impact projectiles, consisting of 55 cans of throwable CS chemical munitions, 10 throwable OC chemical munitions, 10 cans of OC/CS clear-out, 100 kinetic impact projectiles, and 8 noise flash diversionary devices. Tear gas canisters discharged with high velocity into the air pose

4

significant risk of death or serious injury from direct impact to the head. Tear gas itself causes serious bodily injury including severe irritation to the skin, eyes, mouth, nose, and lungs. Kinetic impact projectiles, which include rubber and foam bullets fired from gun-like weapons or launchers, transfer kinetic energy into the body and often possess muzzle velocities equivalent to live ammunition, delivering an impact comparable to being struck by a fast-thrown baseball. FLPD policy designates chest shots as the Red Zone due to the potential for serious or fatal injury, a targeting area considered tantamount to the use of deadly force. Despite this knowledge, FLPD trained officers to target the chest area when engaging subjects with 40mm impact projectiles. During the dispersal on May 31, 2020, several assembled individuals were struck in the face by police-deployed kinetic impact projectiles.

## A.   MUNICIPAL LIABILITY ALLEGATIONS

### 1.   Final Policymaker Theory/Delegation Theory

The Chief of Police serves as the final policymaker for all FLPD policies and reviews and approves all departmental policies prior to implementation and dissemination. In Fort Lauderdale's Manager-Commission form of municipal government, the City Manager exercises no authority over police policy development, protocols, procedures, or implementation and does not direct police tactics or strategies. Chief of Police Rick Maglione authorized the deployment of kinetic impact projectiles and tear gas during the assembly. Maglione was aware that less lethal weaponry was being deployed without warning or a dispersal order by subordinate officers. Despite possessing both the authority to halt the use of tear gas and kinetic impact projectiles and the means to communicate with officers at the scene, Maglione issued no instructions to cease the deployment of these weapons and did not direct his subordinates to terminate their use.

FLPD delegated authority to subordinate officers to exercise discretion in determining when to deploy crowd control tactics against demonstrations without establishing meaningful

5

constraints. The department maintains no official policy governing the deployment of tear gas and kinetic impact projectiles in crowd control situations that would restrict the use of force against crowds containing peaceful and nonviolent demonstrators. The decision to deploy force was not subject to meaningful supervision or review, except to the extent that those delegated the authority, in their sole and unsupervised discretion, deemed appropriate.

2.      Supervisory Authority Allegations

City officials actively monitored the police response to the assembly from the Real-Time Crime Center (RTCC) through police radio communications and television coverage. The monitoring group included the City Manager, all three Assistant Chiefs of Police, the Incident Commander Assistant Chief Douglas MacDougall, several police Majors, and SWAT Commander Captain Steven Greenlaw, among others. Chief of Police Rick Maglione maintained constant communication with the monitoring group via telephone and participated in major decisions throughout the incident. Seven officers exercised supervisory authority over FLPD personnel who deployed chemical munitions and kinetic impact projectiles at SE 2nd Street and SE 1st Avenue: Chief of Police Rick Maglione, Assistant Chief of Police and Incident Commander Douglas MacDougall, SWAT Command Captain Steven Greenlaw, Field Force Commander Captain Robert Deitrich, SWAT Executive Officer Lieutenant Avery Figueras, SWAT Team Leader/Supervisor Paul Cristafaro, and SWAT Team Leader/Supervisor Steven Smith. These Supervising Officers possessed knowledge that tear gas, chemical munitions, and kinetic impact projectiles were being deployed to disperse the assembly without any prior warning or dispersal order.

The Supervising Officers possessed both the authority and ability to halt the deployment of tear gas and kinetic impact projectiles, including their deployment without warning or dispersal order, yet they failed to exercise this authority. Chief of Police Rick Maglione, SWAT Command Captain Steven Greenlaw, Field Force Commander Captain

Robert Deitrich, and SWAT Executive Officer Lieutenant Avery Figueras authorized the deployment of tear gas and kinetic impact projectiles. On-scene command to deploy tear gas and kinetic impact projectiles against demonstrators was given by SWAT Executive Officer Lieutenant Avery Figueras, SWAT Team Leader/Supervisor Paul Cristafaro, and SWAT Team Leader/Supervisor Steven Smith. Through this chain of command, multiple supervisory officers at various levels either authorized or commanded the deployment of force against the lawfully assembled demonstrators.

### 3.   Dispersal orders not given as a matter of Department policy.

FLPD policy requires the issuance of dispersal orders before making mass arrests; however, the department maintains no policy governing the lawful dispersal of assemblies determined to be unlawful, riotous, or tumultuous. In direct violation of Florida Statutes, Section 870.04, which mandates that law enforcement provide dispersal orders to groups they determine are unlawfully, riotously, or tumultuously assembled, FLPD trained its officers that no dispersal order was necessary when responding to scenes where bottles had been thrown. By established policy, custom, and practice, FLPD officers do not provide the dispersal orders required by law, even when they possess both the means and ability to do so. Despite these departmental deficiencies, the Field Force Team brought a pre-recorded dispersal order on a Long-Range Acoustic Device (LRAD) to the FAU Parking Garage, with Defendant Jeffrey Jenkins assigned to operate the equipment.

Upon arrival at the Parking Garage, Defendant Jenkins failed to activate the LRAD's pre-recorded dispersal order before exiting his vehicle, relying instead on his training that dispersal orders were unnecessary in response to the throwing of water bottles. Jenkins possessed both the opportunity and ability to provide the lawfully required dispersal order to the assembled demonstrators before the deployment of force, yet he did not do so. This deliberate failure to issue the required warning, coupled with FLPD's institutional policy and

practice of withholding mandated dispersal orders, violated statutory requirements and deprived demonstrators of notice necessary to comply with dispersal directives.

### 4.   Failure to Train

FLPD maintains no policy providing guidance to department members regarding when to announce unlawful assemblies and issue dispersal orders absent an intent to make mass arrests as outlined in policy 501.10. The department-wide Field Force training course instructs officers how to don gas masks when tear gas is deployed but does not address how to deploy tear gas or kinetic impact projectiles during crowd control situations, nor does the course establish this as a training objective. Similarly, the 40mm Multi Launcher Operator course provided to SWAT and field training officers does not address the specific use of tear gas and less lethal munitions in crowd control situations. Despite SWAT convening for training twice monthly, no training curriculum addresses the critical distinctions and protocols necessary for lawful crowd dispersal.

### B.   THE ON-SCENE SWAT DEFENDANT ALLEGATIONS

Following the incident, SWAT team members submitted incident reports and provided testimony during an Internal Affairs investigation. Although the timelines presented in these reports and testimony are materially contradicted by available body-worn camera footage, the officers' accounts establish that SWAT members were assigned to quick reactionary teams, each equipped with 40mm launchers loaded with gas and foam baton rounds, throwable gas and smoke canisters, and Noise Flash Diversionary Devices. Notably, no SWAT members provided a dispersal order, declaration of unlawful assembly, or warning before deploying force. Several FLPD SWAT officers were deployed to the Parking Garage and witnessed the dispersal and deployment of force against peaceful demonstrators without warning. Rather than intervening despite being positioned to do so, some officers joked and laughed about the force being deployed while others stood idly by as unlawful force was inflicted upon the assembly.

8

Eleven SWAT team members deployed chemical munitions at or near SE 2nd Street and SE 1st Avenue with the explicit intent to disperse the crowd. Those SWAT team members were: SWAT Team Leaders Aryo Rezaie, Zachary Baro, Paul Cristafaro, and Ronald Magno, along with Cameron Burdick, Jesus Fernandez, Raymond Ketchmark, Remy Rodriguez, Eliezer Ramos, Robert Smith, and Sean Walters. Defendant Cristafaro openly acknowledged the objective, stating that the goal was to "disperse the crowd" and "get the crowd to leave, go home." Defendant Ketchmark deployed a gas munition that broke into three pieces emitting green smoke, which he claimed was Department-issued, though other officers disputed this characterization. Defendant Baro admitted deploying both chemical munitions and kinetic impact projectiles for crowd dispersal. Body-worn camera footage captured Baro making derogatory statements as protesters were struck with projectiles. Subsequently, Defendants Chatman and Baro joked and laughed about the force they had deployed, with one officer boasting about hitting individuals with kinetic impact projectiles while the other responded with similar celebratory language.

Six SWAT team members deployed kinetic impact projectiles at or near SE 2nd Street and SE 1st Avenue with the intent to disperse the crowd: SWAT Team Leaders Zachary Baro, Ronald Magno, and Steven Smith, along with Jamie Chatman, Jesus Fernandez, Ryan Ijames, and Eliezer Ramos. Defendant Jesus Fernandez explained during the Internal Affairs investigation that he deployed 40mm CS rounds in a downward angle specifically to disperse the crowd, acknowledging that the gas was deployed in an area to achieve crowd dispersal. Multiple officers confirmed awareness of peaceful demonstrators at the scene. Additionally, eight SWAT team members provided lethal cover at the intersection to protect other SWAT operators and Field Force Team members who were actively dispersing the assembly: Cameron Burdick, Kevin Dupree, Andrew Gottstein, Aryo Rezaie, Remy Rodriguez, Franco Smith,

David Soika, and Sean Walters. Every one of these officers possessed the opportunity and authority to provide a dispersal order.

Officers present at the scene possessed the opportunity and ability to intervene and halt the deployment of tear gas and kinetic impact projectiles against the peaceful demonstrators without prior warning or dispersal order, yet they failed to do so. David Soika explicitly confirmed the purpose of the gas deployment, stating "We were using the gas just purely to disperse them." Rather than taking corrective action, SWAT officers congratulated, celebrated, and joked with each other about striking individuals with kinetic impact projectiles, demonstrating a callous disregard for the rights of the peacefully assembled demonstrators.

In sum, Plaintiffs have sued twenty (20) named Defendants, the City and nineteen (19) named FLPD officers. Plaintiffs assert claims for: First Amendment restriction on speech against all Defendants except the City (Count I) and a separate count against the City (Count II); First Amendment retaliation against all Defendants except the City (Count III) and a separate count against the City (Count IV); Fourteenth Amendment substantive due process violation against the City (Count V); and Fourteenth Amendment procedural due process violation against eleven (11) individual FLPD officers (Count VI) and a separate count against the City (Count VII).

Defendants argue Plaintiffs' Complaint should be dismissed because: (1) Plaintiffs fail to state a § 1983 claim against the City under a final policymaker; policy, practice, or custom; or failure to train theory; (2) Plaintiffs fail to state a § 1983 claim against the Supervising Officers, individually, and they are entitled to qualified immunity on the First Amendment and Fourteenth Amendment claims; (3) Plaintiffs have failed to state a Fourteenth Amendment substantive due process claim; and (4) Plaintiffs have not alleged a cognizable Fourteenth Amendment procedural due process claim.

II.     **MOTION TO DISMISS**

A.      **LEGAL STANDARD**

In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff. *Murphy v. Fed. Deposit Ins. Corp.*, 208 F.3d 959, 962 (11th Cir. 2000) (citing *Kirby v. Siegelman*, 195 F.3d 1285, 1289 (11th Cir. 1999)). The Federal Rules of Civil Procedure do not require claimants to set out in detail the facts upon which they base their claim. Instead, Rule 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). However, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A complaint must contain enough facts to plausibly allege the required elements. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007).

As such, a plaintiff is required to allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted). While the court must assume that all of the allegations in the complaint are true, dismissal is appropriate if the allegations do not "raise [the plaintiff's] right to relief above the speculative level." *Id.* (citation omitted). The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail on his or her theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery to prove the allegations. *See Durham v. Whitney Info. Network, Inc.*, No. 06-CV-00687, 2009 WL 3783375, at *5 (M.D. Fla. Nov. 10, 2009).

B.      **DISCUSSION**

1.      *Monell* Claims

Plaintiffs bring claims under § 1983 against the City for First Amendment violations under Counts II and IV and Fourteenth Amendment violations under Counts V and VII.

11

Although municipalities can be liable under § 1983, the "Supreme Court has placed strict limitations" on that liability. *See Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003). Indeed, the Supreme Court has made clear that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978*); Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1989) (noting a municipality "may not be held liable solely by virtue of the employment relationship linking it to the offending employee"). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *See Monell*, 436 U.S. at 694; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' — that is, acts which the municipality has officially sanctioned or ordered.").

For that reason, to succeed on a § 1983 claim, a plaintiff "must identify a municipal policy or custom that caused his injury." *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (alteration adopted, quotation marks omitted). A plaintiff can do that by: "(1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *See Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022); *Grech*, 335 F.3d at 1329 (noting that plaintiffs can point to either an "officially promulgated" municipal policy or an "unofficial custom or practice" of the municipality "shown through the repeated acts of a final policymaker").

Plaintiffs raise three theories of liability under *Monell*: (1) final policy maker; (2) policy, custom, or practice; and (3) failure to train. The Court will address each theory in turn.

### a.      *Final Policy Maker Delegation Theory*

Municipalities are generally only liable for a single decision made by a municipal official when the official "is the final policymaker for the municipality with respect to the subject matter in question." *Mandel*, 888 F.2d at 793. An official is the final policymaker on a given subject matter when "his decisions have legal effect without further action by the governing body" and "the governing body lacks the power to reverse the [official's] decision." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004). Courts determine whether an official is a final policymaker for the municipality by examining "the relevant positive law, including ordinances, rules and regulations" as well as "customs and practices having the force of law." *Mandel*, 888 F.2d at 793.

A lesser official's decision may subject a municipality to liability in certain circumstances, including delegation. A decision made by a municipal officer who is not a final policymaker can underlie municipal liability when the official was delegated the authority to make the decision by a final policymaker. *Id*. at 792. However, "mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority." *Id*. Liability only attaches under a delegation theory when "the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." *Id*.

Altogether, the FAC indicates that Plaintiffs are proceeding on a final policymaker "delegation" theory. (*See* DE 23 at ¶¶ 60, 62, 146.) Specifically, they allege that "FLPD delegated authority to subordinates to exercise discretion when to deploy crowd control tactics against a demonstration" and that "[t]he decision to deploy force was not subject to supervision or review, except to the extent that those delegated the authority, in their sole and unsupervised discretion, deemed appropriate." (*Id*. at ¶¶ 60, 62.) At the same time, Plaintiff also alleges that

FLPD Chief of Police Maglione is the final policymaker for policies governing FLPD. (*Id.* at ¶¶ 52, 54.)

Plaintiffs further allege that "[f]inal policymakers within the City authorized and directed the deployment of less lethal munitions at demonstrators" at the subject intersection "in order to disperse the crowd." (*Id.* at ¶¶ 143, 160, 170; 195; *see also id.* at ¶ 166.) However, Plaintiffs do not provide any factual support for who these final policymakers are, nor do they provide any details as to whether the policymakers were subject to review. Therefore, this allegation is conclusory.

Plaintiffs further maintain that Chief Maglione: "authorized the deployment of KIPs and tear gas during the assembly"; "knew" they were deployed "to disperse the crowd" and "after Officer Hayes was no longer at the Parking Garage"; "knew less lethal weaponry was being deployed without warning or a dispersal order by subordinate FLPD officers"; "had the authority to stop the use of tear gas and kinetic impact projectiles from being deployed"; "had the means to contact officers at the Parking Garage"; and "gave no instructions to stop using tear gas, chemical munitions, and KIPs, and did not direct his subordinates to issue such orders." (*Id.* at ¶¶ 52, 54-59.) However, Plaintiffs do not allege that Chief Maglione delegated policymaking authority to any subordinates or that any other officer was a final policymaker for FLPD policy.

Notably, the Eleventh Circuit has declared that "the mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. *Rather, the delegation must be such that the subordinate's discretionary decisions* are not constrained by official policies and *are not subject to review.*" *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997) (quoting *Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989)) (emphasis added) (citations omitted). Against this backdrop, Plaintiffs have not adequately pled final policy maker liability under *Monell*.

14

To be sure, Plaintiffs fail to include any factual matter to support their conclusory allegation that the decisions to deploy force were not subject to supervision or review. This is particularly true considering contradictory allegations that Chief Maglione was constantly on the phone with a "Monitoring Group" of city officials that monitored the police response via police radio and television coverage and that Chief Maglione participated in major decisions via telephone during the protest. (DE 23 at ¶ 63.) Ultimately, the lack of factual support combined with the contradictory allegations demonstrate that Plaintiffs final policy maker theory has not "r[isen] . . . above the speculative level." *Twombly*, 550 U.S. at 555.

### b.    *Policy, Practice, or Custom*

Plaintiffs also attempt to establish *Monell* liability by alleging that an FLPD policy was the moving force behind the alleged constitutional law violations. For support, Plaintiffs allege that Florida law requires law enforcement to give a dispersal order when individuals are unlawfully, riotously, or tumultuously assembled. (DE 23 at ¶ 63.) However, FLPD, as a matter of policy, does not give the required dispersal order, even when it has the means and ability to do so. (*Id*. at ¶ 64.) As a consequence, Defendant Jeffrey Jenkins did not activate the LRAD's pre-recorded dispersal order, based on FLPD training that dispersal orders were unnecessary. (*Id*.at ¶ 67.)

Defendants argue that Plaintiffs do not allege facts establishing that the City had a policy, custom, or widespread practice of not giving dispersal orders that was the moving force behind their alleged injuries. Defendants further claim that Plaintiffs contradict their allegation that such a policy existed by alleging that "FLPD's policy requires dispersal orders before making mass arrests, but FLPD has no policy governing the dispersal of an assembly determined to be unlawful, riotous, or tumultuous." (*Id*. at ¶ 70.)

A plaintiff has two methods by which to establish a municipal policy or custom under *Monell*: identify either (1) an officially promulgated policy or (2) an unofficial custom or

practice shown through the repeated acts of a final policymaker for the municipality. *Grech v. Clayton Cty., Ga*., 335 F.3d 1326, 1329–30 (11th Cir. 2003). Rarely can a plaintiff point to a municipality's officially-adopted policy of permitting a particular constitutional violation. Most plaintiffs must show that the municipality has an unofficial custom or practice of permitting the violation and that the custom or practice is the "moving force" behind the constitutional violation. *Doe*, 403 F. Supp. 3d at 1264 (citing *Grech*, 335 F.3d at 1330).

Here, Plaintiffs have failed to "show a longstanding and widespread practice." *Marantes v. Miami-Dade Cty*., 649 F. App'x 665, 672 (11th Cir. 2016) (citation and quotation marks omitted). This requires "considerably more" than a single incident of a constitutional violation. *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). Plaintiffs do not point to any other prior instances of FLPD officers deploying less-lethal munitions to disperse an unlawful crowd in the absence of a dispersal order. As a consequence, Plaintiffs have alleged no similar incidents to establish a widespread practice that is "obvious, flagrant, rampant and of continued duration that would establish a causal connection between actions of the supervising official and the alleged constitutional violation." *Gaviria v. Guerra*, No. 17-23490-CIV, 2018 WL 1876124, at *6 (S.D. Fla. Apr. 19, 2018) (quoting *Whitaker v. Miami-Dade Cty.*, 126 F. Supp. 3d 1313, 1321 (S.D. Fla. 2015)).

Additionally, Plaintiffs offer allegations that appear to contradict their policy or custom argument. For instance, Plaintiffs claim that FLPD has a policy, custom, or practice of not giving dispersal orders. However, Plaintiffs also allege that FLPD pre-recorded a dispersal order on a Long-Range Acoustic Device ("LRAD"), assigned an officer to the LRAD, brought the LRAD and dispersal order to the Parking Garage, and eventually issued a dispersal order. (DE 23 at ¶¶ 33, 73-74). Moreover, on numerous occasions throughout the FAC Plaintiffs allude to FLPD dispersal order policy. (*Id*. at ¶¶ 70, 77.) As a result, Plaintiffs' allegations fall short of a *Monell* claim under a policy, practice, or custom theory.

16

### c.        *Failure to Train*

Plaintiffs aver that the FAC plausibly alleges FLPD's failure to train its officers on crowd management and the use of tear gas and KIPs amounted to deliberate indifference. FLPD equipped officers with dangerous munitions but failed to adequately train the officers on basic crowd-control practices, such as when to issue dispersal orders, how to use force only against specific threats, and how to avoid harming innocent bystanders. (DE 23 at ¶¶ 81-82.)

Conversely, Defendants concede that the FAC alleges that FLPD trained officers that the target area for engaging subjects with 40mm KIPs includes the chest and that "[s]everal individuals assembled were struck in the face by police deployed KIPs." However, Plaintiffs themselves only allege they were affected by tear gas deployment; they do not allege they were struck or injured by a KIP. (*Id*. at ¶ 50.) Accordingly, Defendants argue that the alleged failure to train with respect to KIP targeting or deployment (*see also id*. at ¶¶ 78-79, 83.) was not "closely related to the ultimate injury." *Harris*, 489 U.S. at 391. Moreover, Defendants contend that Plaintiffs do not allege facts establishing that the City knew of a need to train in these particular areas and made a deliberate choice not to take action. Further, Plaintiffs reference only the subject incident, not any prior incident(s) that would have alerted the City of a need for training in these specific, particular areas.

The failure-to-train theory recognizes that inadequate training "may serve as the basis for § 1983 liability . . . where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To show "deliberate indifference" in a failure-to-train case, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350. The Eleventh Circuit has repeatedly held that, "without notice of a need to train or supervise in a particular area, a municipality cannot be liable as a matter of law" under a

*Monell* theory. *Id*. at 1351; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407-08 (1997) ("In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury."). The Eleventh Circuit has emphasized that "[e]stablishing notice of a need to train or supervise is difficult." *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1189 (11th Cir. 2011).

As an initial matter, Plaintiffs rely heavily on Judge Ruiz' summary judgment order in *Ratlieff v. City of Fort Lauderdale*, 748 F. Supp. 3d 1202, 1215 (S.D. Fla. 2024). However, the Court notes that the *Ratlieff* order is not binding on this court. More importantly, there is a key distinction that precludes the *Ratlieff* order from being persuasive authority in the instant case. To be more specific, Judge Ruiz focused on alleged inadequacies in training pertaining to KIPs specifically, such as aiming KIPs and firing KIPs while wearing a gas mask. *Id*. at 1267. This is because the plaintiff in that case plausibly alleged that her most serious injuries resulted from an officer's missed shot while wearing a gas mask. *Id*. A task that the record showed the officer had not performed since SWAT school in 2016 and that FLPD had not trained him to perform at any time. *Id*. Here, on the other hand, none of the named Plaintiffs alleged they were struck by a KIP. (*See* DE 51 at 7-8.) Consequently, the training deficiencies pertaining to KIP training repeatedly emphasized by Judge Ruiz in *Ratlieff* would not apply in this case, where the Plaintiffs allege they were only affected by tear gas.

However, both the Supreme Court and the Eleventh Circuit have acknowledged that, in some cases, a need to train municipal employees may be "so obvious" that the municipality could still face *Monell* liability even without a pattern of prior constitutional violations. *Bryan Cnty*., 520 U.S. at 409-10; *Weiland v. Palm Beach Cnty*., 792 F.3d 1313, 1329 (11th Cir. 2015) (noting "that evidence of previous incidents is not required to establish city policy if the need

to train and supervise in a particular area is 'so obvious' that liability attaches for a single incident.") (cleaned up). But, the Eleventh Circuit further explained in *Mingo v. City of Mobile, Ala*, "[t]he Supreme Court has cautioned that the exception creating municipal liability under § 1983 for failure to train applies in only a very narrow range of circumstances and a municipality's culpability 'is at its most tenuous where a claim turns on failure to train.'" 592 F. App'x 793, 800 (11th Cir. 2014) (quoting *Connick v. Thompson,* 563 U.S. 51, 61, (2011)).

Indeed, the Supreme Court has provided only a single hypothetical example in *dicta* recognizing an obvious need for training: in the use of deadly force where firearms are provided to police officers. *Mingo,* 592 F. App'x at 800–01 ("[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." (quoting *City of Canton*, 489 U.S. at 390 n.10)).

Plaintiffs' contention that the City failed to train or supervise its employees regarding the use of dispersal orders and tear gas falls short of the narrow range of circumstances giving rise to *City of Canton*'s hypothetical liability for a municipality based on a single incident as a matter of law. *See Keith v. DeKalb Cnty*., 749 F.3d 1034, 1053 n.56 (11th Cir. 2014) ("Although the Supreme Court has left open the possibility that a single incident may prove sufficient to hold a supervisor liable for a failure to train . . . we decline to use this case as the vehicle for flushing out the Supreme Court's hypothetical basis for § 1983 relief."); *Lewis v. City of W. Palm Beach, Fla*., 561 F.3d 1288, 1293 (11th Cir. 2009) (finding that the need for training concerning the application of the hobble restraining device does not rise to a sufficient level of obviousness); *Gold*, 151 F.3d at 1352 (holding plaintiff's "contentions that the police officers were inadequately trained and/or supervised regarding the disorderly conduct statute and the

19

proper response to handcuff complaints fall[ ] far short of the kind of obvious need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city"); *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 942 (11th Cir. 2017) ("The Supreme Court has never determined that the need for 'more or different' training was obvious."). Against this backdrop, Plaintiffs failed to adequately plead a *Monell* claim against the City. Therefore, Counts II, IV, V, and VII against the City are dismissed.

### 2.     Qualified Immunity

Counts I and III are against the individual Defendnats, including the Supervising Officers. The Supervising Officers raise the defense of qualified immunity in response to the alleged First Amendment violations under Counts I and III. "The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1157 (11th Cir. 2010) (citation and internal quotation marks omitted). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. (citation and internal quotation marks omitted).

When an official asserts qualified immunity, "[t]he district court must first decide whether 'the defendant was engaged in a discretionary function.'" *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F. 4th 1329, 1333 (11th Cir. 2025) (quoting *Holloman*, 370 F. 3d at 1264). If so, "the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Holloman*, 370 F.3d at 1264 (emphasis omitted). The plaintiff must then establish that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id*. At this stage, district courts may "exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Townsend*, 601 F.3d at 1158 (citation and internal quotation marks omitted).

Finally, "[t]he Supreme Court has [ ] 'repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, (1991)). This is because qualified immunity "is an immunity from suit rather than a mere defense to liability; and . . .it is effectively lost if a case is erroneously permitted" to go forward. *Id*. (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, (1985)).

### a.        Discretionary Authority

Beginning with the discretionary function analysis, the question turns on whether the official was "engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains." *Holloman*, 370 F.3d at 1264. Put another way, courts examine whether the actions "are of a type that fell within the employee's job responsibilities." *Id*. at 1265. The inquiry is two-fold: "We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id*.

Here, Defendants argue that the allegations of the FAC demonstrate that the Supervising Officers acted within their discretionary authority in allegedly authorizing the deployment of tear gas and impact projectiles, because such actions, "if done for a proper purpose," would be within, or reasonably related to, their duties as supervising police officers. *See e.g. Williams v. Mallet*, 707 F. Supp. 3d 1340, 1354 (S.D. Fla. 2023) ("The Officers in our case were acting within their discretionary authority because stops and arrests are powers that legitimately form a part of their job.") (internal quotations omitted)). The Court agrees that these allegations establish that the officers were acting within their discretionary authority. *See Holloman*, 370 F.3d at 1264.

21

b.      *Clearly Established Right*

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). In addressing a motion to dismiss on qualified immunity, the Court may begin by addressing either the existence of a constitutional violation or the question of whether the right being violated has been "clearly established." *Pearson v. Callahan*, 555 U.S. 223, 235 (2009).

A right may be clearly established for qualified immunity purposes in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis*, 561 F.3d at 1291–92 (internal citations omitted).

A "clearly established right must be defined with specificity . . ." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). Supreme Court cases, Eleventh Circuit caselaw, and state Supreme Court caselaw can 'clearly establish' law in the Eleventh Circuit. *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003) (citation omitted). In addition, "persuasive decisions from other circuits can be considered in determining whether a violation was one of 'obvious clarity' for purposes of qualified immunity." *Gilmore v. Ga. Dep't of Corrections*, 144 F.4th 1246, 1263 (11th Cir. 2025).

Here, because the Court has determined that the officers were acting in their discretionary authority, the burden shifted to the Plaintiffs to show that qualified immunity is inappropriate. *See Lee*, 284 F.3d at 1194. To meet their burden, Plaintiffs must establish that each of the Supervising Officers violated a constitutional right and that the right was clearly established at the time of the violation. *See Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018)

22

(Courts "must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged.").

Plaintiffs argue that they have met this burden because the FAC alleges the Supervising Officers either: (1) personally participated in the alleged constitutional violation; (2) directed the subordinates to act unlawfully; or (3) knew that the subordinates would act unlawfully and failed to stop them. (DE 23 at ¶ 140.) Plaintiffs further argue that they should not be made to plead details such as when the specific commands were issued, where the force was directed, or who the intended targets were, because these are granular details not required under *Iqbal*. Plaintiffs further contend that caselaw clearly establishes the Supervising Officers' actions of ordering or failing to stop their subordinates from deploying tear gas and KIPs into a crowd where some individuals in that crowd are throwing objects directly at police constitute a constitutional violation.

Defendants disagree. First, Defendants point out that Plaintiffs allege Chief Maglione was an off-site supervising officer who was not physically present at the subject intersection when the alleged First Amendment violations occurred, did not personally participate in the alleged violations, and did not direct subordinates to deploy tear gas or KIPs. Therefore, Chief Maglione had no reason to know that subordinates were acting unlawfully based on the information being relayed to him. Accordingly, Plaintiffs have not established the requisite "causal connection between actions of the supervising official and the alleged constitutional violation." *See Keating v. City of Miami,* 598 F.3d 753, 762 (11th Cir. 2010).

In response, Plaintiffs argue that the allegations that Chief Maglione authorized the deployment of tear gas and KIPs during the protest, knowing they were being used without a dispersal order or lawful justification, yet failed to stop their continued use are enough to establish supervisory liability. As a result, whether Maglione was on-site or not, he actively participated in the suppression of First Amendment-protected speech. Plaintiffs then cite

*Robertson v. City of St. Louis*, No. 4:18-CV-01570 JAR, 2021 U.S. Dist. LEXIS 186855, at \*25 (E.D. Mo. Sep. 29, 2021), for the broad proposition that other courts have found similar allegations sufficient to establish supervisory lability.

The Court finds Plaintiffs' arguments regarding Chief Maglione unpersuasive. As an initial matter, at the time the instant motion was filed, Eleventh Circuit precedent seemed to suggest that Plaintiffs could not rely on sources outside the Supreme Court, the Eleventh Circuit, and the Florida Supreme Court to show a clearly established right for purposes of qualified immunity. *See, e.g., Brooks v. Miller*, 78 F.4th 1267, 1280 (11th Cir. 2023). However, in *Gilmore v. Georgia Department of Corrections*., the Eleventh Circuit acknowledged discrepancies in the caselaw on this issue and clarified that "persuasive decisions from other circuits can be considered in determining whether a violation was one of 'obvious clarity' for purposes of qualified immunity.'" 144 F.4th 1246, 1263 (11th Cir. 2025). Notwithstanding the discrepancies and subsequent clarification, the Court finds that the single Eastern District of Missouri case cited by Plaintiff unpersuasive to establish a clearly established right as to Chief Maglione. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). The Court ultimately agrees with Defendants that Chief Maglione cannot be held liable for alleged violations of Plaintiffs' First Amendment rights under a § 1983 supervisory theory of liability, where he was not physically present, did not personally participate and did not direct subordinates to deploy tear gas or KIPs as the FAC suggest.

With regard to the Supervising Officers, Plaintiffs allege that the on-site Supervising Officers other than Dietrich (Figueras, Cristafaro, and Steven Smith) "gave on-scene command to deploy tear gas and KIPs against demonstrators." (DE 23 at ¶ 69.) Moreover, the FAC alleges the Supervising Officers authorized the deployment of unlawful force, failed to distinguish between isolated misconduct and the peaceful majority, and indiscriminately deployed tear gas

and dangerously deployed KIPs without issuing a dispersal order. As a result, the Supervising Officers clearly violated established First Amendment protections.

In support, Plaintiffs cite a Second Circuit opinion and an unpublished Eleventh Circuit decision. However, "an unpublished opinion is incapable of clearly establishing law for qualified-immunity purposes." *Trotter v. Shull*, 720 F. App'x. 542, 544 (11th Cir. 2017). Moreover, the facts in *Toole v. City of Atlanta*, 798 F. App'x 381, 387 (11th Cir. 2019) are distinguishable to the instant case. To illustrate, the plaintiff in *Toole* alleged that the defendant officer "pulled him off of the sidewalk and into the street, throwing him to the ground and causing several injuries, including a chipped tooth" and "thereafter placed flex cuffs on [his] wrist, arrested him, and escorted him to an APD paddy wagon." *Id*. at 384. The Court ultimately found that reading the facts in plaintiff's favor, "he was unlawfully arrested without arguable probable cause while engaging in protected First Amendment conduct—protesting and filming police activities—specifically to stop him from doing so." *Id*. at 388. As a result, the court held that the officer violated plaintiff's clearly established First Amendment rights and was not entitled to qualified immunity. These facts are too dissimilar to the facts here to establish that the Supervising Officers violated Plaintiffs clearly established rights.

The same is true for Plaintiffs' citation to *Jones v. Parmley*, 465 F.3d 46, 57 (2d Cir. 2006). Notably, Plaintiffs do not materially analyze this case. In fact, there was no attempt made to compare the facts in that case with the instant case. Instead, Plaintiffs summarily state that the Second Circuit held that "it was clearly established that isolated violations of the law by some demonstrators did not justify law enforcement's wholesale suppression of an entire protest without warning." (DE 52 at 13.) This is because the facts in *Jones* are distinguishable. There, the court found "the facts as alleged by plaintiffs reveal an orderly, peaceful crowd, the overwhelming majority of whose members had not entered the I–81 roadway." *Jones*, 465 F.3d

at 58. Here, on the other hand, the allegations of the FAC indicate that there were unlawful protestors who were violent towards FLPD.

Ultimately, it is axiomatic, that government officials may stop or disperse public demonstrations or protests where "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears." *Cantwell v. Connecticut,* 310 U.S. 296, 308, (1940). In the instant case, the allegations of disorder in the FAC indicate that the Supervising Officers did not violate Plaintiffs' First Amendment Rights during the protest. Moreover, Plaintiffs have failed to provide caselaw that would have adequately put the Supervising Defendants on notice of the governing principle that police supervisors violate a person's First Amendment rights when they order or fail to stop their subordinates from deploying tear gas and KIPs into a crowd where some individuals in that crowd are throwing objects directly at police. As a result, Plaintiffs have not met their burden, and the Supervising Officers are entitled to qualified immunity under Counts I and III.

### 3. Substantive Due Process under the Fourteenth Amendment

Plaintiffs bring Substantive Due Process claims against the City under Count V. To state a claim for a violation of substantive due process under 42 U.S.C. § 1983, a plaintiff must allege "a deprivation of a constitutionally protected interest" resulting from "an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation." *Executive 100, Inc. v. Martin Cnty.*, 922 F.2d 1536, 1541 (11th Cir. 1991) (citation omitted). "'[C]onduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense.'" *Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013) (alteration added) (quoting *Waddell v. Hendry Cnty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003)).

Plaintiffs argue that the City's conduct violated substantive due process in part because FLPD acted with a purpose to harm, unrelated to any legitimate law enforcement objective. First, FLPD was the initial aggressor. Officer Pohorence unjustifiably pushed a kneeling demonstrator, provoking unrest. (DE 23 at ¶¶ 15-16.) Second, FLPD deployed 205 rounds of tear gas and KIPs for nearly an hour, without issuing any warning or dispersal order. (DE 23 at ¶¶ 19-34, 35.) Third, body-worn camera footage captures FLPD mocking and celebrating the harm inflicted on demonstrators, with officers laughing and joking about striking individuals. (DE 23 at ¶ 94.) This callous behavior shows an intent to punish and intimidate, not to maintain public safety.

In response, Defendants aver that Plaintiffs have failed to state a substantive due process claim against the City, as the facts alleged are insufficient to establish that the City's conduct was sufficiently arbitrary or conscious-shocking to sustain such a claim. Moreover, Defendants claim the alleged facts do not establish that the deployment of tear gas and impact projectiles under the totality of the circumstances was "so brutal or inhumane as to shock the judicial conscience." *Peterson v. Baker*, 504 F.3d 1331, 1340 (11th Cir. 2007); *see also Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 855 (1998) ("Regardless whether Smith's behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and petitioners are not called upon to answer for it under § 1983.")

For support, Defendants cite several cases. First, *AFL-CIO v. City of Miami*, where the Eleventh Circuit held that a plaintiff's "incidental exposure to pepper fumes for a short period of time is not a sufficient basis to state an excessive force claim." 637 F.3d 1178, 1191 (11th Cir. 2011). Additionally, Defendants cite the order on the motion to dismiss in the same case where Judge Ungaro's determined that  "Police officers' (1) use of less than lethal weapons; (2) denial of Plaintiffs' access to their property; and (3) detention of Plaintiffs and other

protestors at gunpoint in the context of attempting to control a protest march cannot be said to shock the Court's conscience." *Am. Fed'n of Lab.-Cong. of Indus. Orgs. v. City of Miami*, No. 07-22966-CIV, 2008 WL 11333331, at *6 (S.D. Fla. Sept. 4, 2008). Notably, in this instant case there are no allegations that protestors were held at gunpoint. Nonetheless, the facts are similar enough to warrant a similar finding in the instant case that the City's behavior did not violate substantive due process.

This is supported by other cases cited by Defendants where the Eleventh Circuit found circumstances more egregious than the claims pled in the instant case were not "conscious shocking" in a constitutional sense. *See, e.g., McCants v. City of Mobile*, 752 F. App'x. 744, 749 (11th Cir. 2018) (holding that officer's alleged conduct towards mother at scene of her daughter's automobile accident, yelling at and punching her in the chest, did not shock the conscience, as required to state a substantive due process claim); *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (military college instructor who slammed classroom door in student's face, resulting in student's arm becoming lodged in shattered glass window pane, and then violently swung the door several times in an attempt to knock plaintiff back from the door, and finally shoved her in the face, trying to forcibly dislodge her arm from the window, did not deprive her of substantive due process).

Furthermore, to the extent Plaintiffs attempt to rely on the alleged City policy of not providing dispersal orders as an independent basis for their substantive due process claim, the claim would be subsumed by Plaintiffs' First Amendment claims. *See Cotriss v. City of Roswell*, No. 19-12747, 2022 WL 2345729, at *8 (11th Cir. June 29, 2022) (stating, with respect to a substantive due process claim pled under the Fourteenth Amendment, "the proper vehicle for [plaintiff] to have alleged a First Amendment deprivation is the First Amendment itself"); *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ("[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular

28

sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." ) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion)). Accordingly, in addition to Plaintiff's failure to plead a *Monell* claim, Count V is dismissed for failure to state a Substantive Due Process claim against the City.

### 4.   Procedural Claims under the Fourteenth Amendment

Plaintiffs bring Procedural Due Process claims against the City, Defendants Maglione, Deitrich, Avery, Cristafaro, Baro, Steven Smith, Magno, Jenkins, Burdick, Chatman, and Ketchmark in Counts VI and VII. Plaintiffs argue that the actions of the City and the officers violated their right to procedural due process, protected by the Fourteenth Amendment. Section 1983 creates a private right of action against persons who, under color of law, subject a plaintiff to a deprivation of federally-protected rights. 42 U.S.C. § 1983. To state a § 1983 claim, Plaintiff must allege that the Defendants acted under color of state law to deprive Plaintiff of a federal right. *See West v. Atkins*, 487 U.S. 42, 48, (1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 535, (1981); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, (1978)). The facts that a plaintiff must plead in order to allege the violation of a federal right depend upon the right allegedly violated—here, the right to procedural due process. A procedural due process claim has three elements: (1) a deprivation of a constitutionally-protected interest; (2) state action; and (3) constitutionally-inadequate process. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) (citing *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)).

Plaintiffs argue that they have met each element. As to the first element, Plaintiffs argue that their allegation that freedom of speech and the right to peacefully assemble in a public forum are fundamental components of the liberty safeguarded by the Due Process Clause to the U.S. Constitution is sufficient. As to the second element, Plaintiffs argue that the process utilized by the Defendants to suppress the Plaintiffs' assembly and speech were

unconstitutional. Moreover, Plaintiffs argue that the Constitution required Defendants to issue a dispersal order before resorting to force. However, even assuming arguendo that the Plaintiffs have adequately plead these elements, the Court finds that Plaintiffs have failed to adequately plead the third element: that there was an inadequate state remedy.

To illustrate, in their claims for procedural due process, Plaintiffs seek compensatory damages, costs, injunctive relief, and attorney's fees—relief that Plaintiffs could seek by suing for the same relief in state court. *See Young v. Akal*, 985 F. Supp. 2d 785, 804 (W.D. La. 2013) ("[I]t is clear a claim of deprivation of procedural due process cannot proceed, because the plaintiffs have adequate post-deprivation state tort remedies to pursue a recovery for their alleged injuries, that is, plaintiffs may bring state tort actions against the deputies in question to attempt to recover for the injuries they allege."); *Ellsworth v. City of Lansing*, 34 F. Supp. 2d 571, 579–80 (W.D. Mich. 1998) (finding demonstrators' procedural due process claim based on their alleged entitlement to some form of notice or process prior to the release of tear gas "barred" because they failed to prove the inadequacy of state post-deprivation remedies); *see also McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (holding that, in the context of a property deprivation, a plaintiff has not suffered a violation of his or her procedural due process rights unless and until the State of Florida refuses to make available a sufficient means to remedy the deprivation).

As the Eleventh Circuit has stated:

> Only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise. It is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim.

*Cotton v. Jackson*, 216 F.3d 1328, 1330–31 (11th Cir. 2000). Because the remedies Plaintiffs seek are available in the state court, their procedural due process claims must be denied. *See Daniels v. Town of Palm Beach, Fla.*, No. 25-CV-80368-RLR, 2025 WL 2390511, at *4 (S.D.

Fla. Aug. 18, 2025) ("Because Plaintiffs currently have adequate process available to them by suing in state court for declaratory or injunctive relief—the same relief Plaintiffs seek under their procedural due process claim here—or inverse condemnation, the Court dismisses Count II."). Accordingly, Counts VI and VII are dismissed.

## III.    CLASS CERTIFICATION

Plaintiffs seek to certify two classes. The two proposed class are those present in a defined location in downtown Fort Lauderdale, on May 31, 2020, and subjected to deployment of less-lethal force by FLPD, or unlawful dispersal order. Plaintiff contends that class membership can be determined through arrest records, medical records, video footage, media accounts, and eyewitness testimony. The Damages Class is defined as those persons present at or near SE 2nd Street and SE 1st Avenue, Fort Lauderdale, Broward County, Florida on May 31, 2020, between 6:50 p.m. and 8:00 p.m., who were subjected to FLPD's crowd dispersal tactics. This Damages Class includes two subclasses: 1) those subject to less-lethal force; and 2) those who were not subject to less lethal force but were driven from the area as a result of FLPD dispersal tactics.

The proposed Injunctive Relief Class is defined as all persons present at or near SE 2nd Street and SE 1st Avenue, Fort Lauderdale, Broward County, Florida on May 31, 2020, between 6:50 p.m. and 8:00 p.m., or may in the future, participate in, or be present at, demonstrations within the City in the exercise of their rights of free speech, assembly, and petition in general, and particularly as related to protesting police violence and discrimination against people of color, especially Black Americans.

For the reasons stated below, both the Damages Class and the Injunctive Relief Class are not apt to produce common answers that drive the resolution of Plaintiffs' claims. Consequently, class certification is denied.

### A.       CLASS ACTION CERTIFICATION LEGAL STANDARD

District courts have broad discretion in deciding whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992). To certify a class action, the putative class must satisfy "the four requirements listed in Rule 23(a), and the requirements listed in any of Rule 23(b)(1), (2), or (3)." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) (citing *Little v. T–Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)); *see also Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1282 (11th Cir. 2011) ("[T]he putative class must meet each of the four requirements specified in [Rule] 23(a), as well as at least one of the three requirements set forth in [Rule] 23(b)."); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000) ("A class action may be maintained only when it satisfies all of the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b).") (quoting *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997)).

"Under Rule 23(a), every putative class first must satisfy the prerequisites of numerosity, commonality, typicality, and adequacy of representation." *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009) (quoting Fed. R. Civ. P. 23(a); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187–88 (11th Cir. 2003)) (internal quotation marks omitted). Under Rule 23(b)(2), class certification is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"The burden of establishing these requirements is on the plaintiff who seeks to certify the suit as a class action." *Heaven v. Trust Co. Bank*, 118 F.3d 735, 737 (11th Cir. 1997); *see also Rutstein*, 211 F.3d at 1233. The moving party "must affirmatively demonstrate his compliance" with the class certification requirements. *Comcast Corp. v. Behrend*, 569 U.S. 27,

32

33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). That is, "a party must not only be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a) [but also] satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* (emphasis in original). "A district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class." *Vega*, 564 F.3d at 1266 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).

## B. CLASS ACTION CERTIFICATION DISCUSSION

### 1. The Damages Class

As an initial matter, the Court notes that because the City has been dismissed as a result of Defendants' Motion to Dismiss it is unclear how a class could proceed with only the individual officers remaining in this case. Nonetheless, the Court addresses the general issues with the proposed classes that would warrant denial of the Motion to Certify Class even if the City remained a Defendant. That said, the Court is unpersuaded that the commonality prong under Federal Rule of Civil Procedure 23(a) is established as to the Damages Class. The Damages Class includes two subclasses: 1) those subject to less-lethal force; and 2) those who were not subject to less lethal force but were driven from the area as a result of FLPD dispersal tactics. Plaintiffs allege that FLPD's "indiscriminate" deployment of tear gas and less-lethal munitions against crowds that included peaceful demonstrators constituted "excessive force" and "was conscious-shocking, malicious, sadistic, and/or objectively unreasonable." These allegations would certainly require individualized fact finding. *See Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989) (finding excessive force determinations "cannot be made *en masse*, and such suits therefore are especially unsuited to class disposition").

Notably, even the putative representative Plaintiffs themselves were allegedly

engaging in different activities. Plaintiffs Jackson and Gabelus were participating in the protests, while Plaintiff Ross was merely observing and recording. (DE 23, p. 1, ¶¶ 46-50). Plaintiffs allege that FLPD trained officers that the target area for engaging a subject with 40mm kinetic impact projectiles (KIPs) includes the chest and that "[s]everal individuals assembled were struck in the face by police deployed KIPs." (DE 23, ¶¶ 43-44.) However, Plaintiffs themselves only allege they were affected by tear gas deployment; they do not allege they were struck or injured by a KIP. (*Id.* at ¶ 50).

Additionally, the Damages Class would also include Plaintiffs' asserted claims for First Amendment retaliation under Counts III and IV. Courts have denied certification of First Amendment retaliation arising out of a protest because the "[t]he subjective nature of the but-for causation analysis proves fatal to commonality." *Black Lives Matter D.C. v. United States*, 775 F. Supp. 3d 241, 271 (D.D.C. 2025). As the court explained in *Black Lives Matter D.C.*, "[u]nlike the speech restriction claims, which can be resolved by assessing the crowd as a whole, the First Amendment retaliation claims will require an analysis of the injuring officer's subjective motive with respect to each class members [sic]." *Id.* at 271. This type of analysis inevitably presents individualized questions of fact and law. *See also Don't Shoot Portland v. City of Portland,* No. 3:20-CV-00917-HZ, 2022 WL 2700307, at *12 (D. Or. July 12, 2022) (explaining that despite plaintiffs positing common questions regarding the proposed First Amendment class, "these common questions cannot generate common answers that drive the resolution of Plaintiffs' First Amendment retaliation claim for all members of this broad class."). Under these circumstances, the Motion to Certify the Damages Class is denied.

### 2.      The Injunctive Relief Class

Even assuming Plaintiffs met the requirements under Federal Rule of Civil Procedure 23(a), Plaintiffs have failed to satisfy any of the requirements of Rule 23(b) necessary for class certification. Specifically, Plaintiffs attempt to establish class certification under Rule

23(b)(2) and 23(b)(3). For support, Plaintiffs contend that the central question is whether dispersal without warning violated the rights of hundreds of peaceful protestors. Additionally, Plaintiffs articulate an injunctive remedy that can be applied to all class members: an FLPD policy that will prevent the constitutional violations that occurred on May 31, 2020, from occurring again. That includes disallowing less-lethal force to be used against law abiding, peaceful protestors exercising their constitutional rights, without proper cause or warning.

In response, Defendants rely heavily on *NAACP of San Jose/Silicon Valley v. City of San Jose*, No. 21-CV-01705-PJH, 2023 WL 2823506, at *6 (N.D. Cal. Apr. 7, 2023), which also arose from a George Floyd protest where less-lethal force was deployed against protestors. There, the plaintiffs sought to certify an injunctive relief class defined as:

> all persons who have in the past participated, presently are participating, or may in the future participate in, or be present at, demonstrations within the city of San Jose in the exercise of their rights of free speech, assembly, association, petition, and of the press, in general, and particularly as it relates to protesting police violence and discrimination against people of color.

*Id*. at *3. The court ultimately denied certification under Federal Rule of Civil Procedure 23(b)(2) for two reasons. First, the court highlighted a vagueness issue with regard to the scope and nature of the injunctive relief that plaintiffs were seeking. The court explained that for the first time in their reply briefs, plaintiff stated that there were seeking to enjoin "the indiscriminate use of impact munitions and baton on peaceful protestors" and "to ensure the written policy is followed, plaintiffs also seek training and accountability measures." *Id*. at *6. The plaintiffs provided no further details.

Next, the court explained that "[e]ven putting aside vagueness problems, the larger obstacle to certification under rule 23(b)(2) is the cross-cutting, non-overlapping nature of the various claims brought by different plaintiffs against different defendants." *Id.* More specifically, the court noted that "[r]ather than bringing suit against only command personnel and focusing on their authorization of force, the plaintiffs in this case challenge both the

35

authorization of force by command personnel as well as the application of force by line officers." As a result, the court determined that "[t]he number of individual, non-overlapping claims brought by different sets of plaintiffs against different sets of defendants prevents the court from concluding that defendants' conduct applies generally to the class." *Id*.

The court finds *NAACP of San Jose/Silicon Valley* instructive. In fact, the proposed Injunctive Relief Class in the instant case closely mirrors the proposed class in *NAACP of San Jose/Silicon Valley*. More importantly, as currently defined, the Injunctive Class includes *all* persons regardless of whether those individuals were engaged in active aggression or not. Moreover, the Injunctive Relief Class includes those individuals who may have been subjected to force by officers, individuals who engaged with but were not subjected to force by officers, and others who may not have interacted with police at all. Given the variety of claims, categories of persons engaged in differing types of activities, and broad scope of the intended class, it is unclear that a single injunction or declaratory judgment could provide relief for the entire proposed Injunctive Relief Class. This conclusion is consistent with other courts facing similar issues beyond just *NAACP of San Jose/Silicon Valley*. For example, in vacating certification of an injunctive relief class the Ninth Circuit stated that "[m]ost courts faced with George Floyd protest classes seeking injunctive relief under Rule 23(b)(2)" had been denied certification. *Black Lives Matter Los Angeles v. City of Los Angeles,* 113 F.4th 1249, 1266 (9th Cir. 2024); *see also Don't Shoot Portland v. City of Portland*, No. 3:20-CV-00917-HZ, 2022 WL 2700307, at *11 (D. Or. July 12, 2022).

For similar reasons, Plaintiff's motion for class certification under Federal Rule of Civil Procedure 23(b)(3) must also be denied for failure to meet the predominance requirement. Though similar to the commonality requirement under Rule 23(a)(2), predominance is "far more demanding." *Vega*, 564 F.3d at 1270. Rule 23(b)(3) requires a court to find "that the questions of law or fact common to class members predominate over any questions affecting

only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Common issues of fact and law predominate if they have a *direct impact* on every class member's effort to establish liability *that is more substantial than the impact of any individualized issues* in resolving the claims of each class member." *See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) (quoting *Vega*, 564 F.3d at 1270).

Here, all proposed class members must demonstrate that their rights were in fact violated and that the challenged policy was the cause of those violations. This will surely involve individualized inquiries. Subsequently, the Court would then need to determine what particular injury a given class member suffered, whether that injury amounted to a deprivation of that individual's rights, and whether the injury was actually caused by one or more of the challenged policies and did not have some other, independent cause. Given the broad scope and overlapping claims, these types of inquiries will likely predominate over common questions to the class. As a result, Plaintiff's Motion to Certify Class is denied.

## IV.   CONCLUSION

Accordingly, it is

**ORDERED** that

1.  Defendants' Motion to Dismiss [DE 51] is **GRANTED:**

    a.  Plaintiffs' 1983 claims against the City in Counts II, IV, V, and VII are **DISMISSED**.

    b.  Plaintiffs' 1983 claims against the Supervising Officers in Counts I and III are **DISMISSED**.

    c.  Count VI is **DISMISSED**.

2.  Corrected Plaintiffs' Motion for Class Certification, with Incorporated Memorandum of Law is [DE 64] is **DENIED**.

**DONE and ORDERED** in Fort Lauderdale, Florida, this 12th day of March, 2026.

Cc: counsel of record

RODNEY SMITH
UNITED STATES DISTRICT JUDGE

38